**In the Matter of PENN CENTRAL TRANSPORTATION COM-PANY, Debtor.**

**In re PENNCO SETTLEMENT AGREEMENT.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

April 16, 1973.

Paul, Weiss, Wharton, Rifkind & Garrison, by Simon H. Rifkind, Gerald Stern, John E. Massengale, Peter Westen, Washington, D. C., and Charles R. Dickey, New York City, for trustees, Penn Cent. Transp. Co.

Sullivan & Worcester, by Joseph Auerbach, Edward Woll, Jr., Boston, Mass., and Laura S. Zucker, Boston, Mass., and Gratz, Tate, Spiegel, Ervin & Ruthrauff, by Spencer Ervin, Jr., Philadelphia, Pa.,

for Richard Joyce Smith, trustee, New York, N. H. & H. R. Co.

Reavis & McGrath, by Lawrence W. Boes, and Leonard M. Leiman, New York City, for special representatives Noyes Leech and Robert H. Mundheim.

David Berger, P. A., by David Berger and Michael Simon, Philadelphia, Pa., for Penn Cent. Co.

Wolf, Popper, Ross, Wolf & Jones, by Benedict Wolf, New York City, and Goodis, Greenfield, Henry, Shaiman & Levin, by Richard L. Gerson, Philadelphia, Pa., for Anita Brady.

Montgomery, McCracken, Walker & Rhoads, by John S. Estey, Philadelphia, Pa., for National Bank of Detroit.

James F. Dausch, Department of Justice, for United States of America.

Fox, Rothschild, O'Brien & Frankel, by Nochem S. Winnet, Philadelphia, Pa., for First Nat. City Bank of New York.

Ballard, Spahr, Andrews & Ingersoll, by Richardson Blair, Philadelphia, Pa., for Girard Trust Bank.

Davis, Polk & Wardwell, by Stephen Case, New York City, for Morgan Guaranty Trust Co. of New York.

O'Melveny & Myers, by Donald Wessling, Los Angeles, Cal., for Pennsylvania Co.

Drinker, Biddle & Reath, by Jack B. Justice, Philadelphia, Pa., for Chase Manhattan Bank and Girard Trust Bank.

Wolf, Block, Schorr & Solis-Cohen, by Bernard Chanin, Philadelphia, Pa., for First Pennsylvania Banking & Trust Co., Indenture Trustee.

## OPINION AND ORDER NO. 1189

FULLAM, District Judge.

The Debtor owns 100% of the common stock of the Pennsylvania Company, which is essentially a holding company for a variety of corporate enterprises, principally in non-railroad fields. In early 1969, and for some time previously, the Debtor was indebted to a group of banks in the sum of $100 million, represented by short-term unsecured notes.

In April of 1969, the line of credit was increased to $300 million, and the Debtor pledged its Pennco stock as security. Some 53 banks throughout the country were parties to or ultimately participated in the loan transaction.

Through a series of petitions (Documents Nos. 3960, 4077, 4624, 5010, and 5042) the Trustees seek approval of a settlement agreement, pursuant to which the claims of 49 of these 53 banks would be discharged, in exchange for transfer to these banks of 95⅔% of the common stock of Pennco.

The proposed settlement appears to have the express or tacit approval, not only of the settling banks and the Trustees, but also of the Institutional Investors group, and certain indenture trustees. The United States government and the Interstate Commerce Commission both oppose consummation of the settlement agreement at the present time, although for different reasons. The bondholders represented by the "special representatives" (substitute fiduciaries appointed for purposes of this case with respect to certain bond issues in which the settling banks are named as indenture trustees, and therefore have a conflict of interest), the New Haven trustee, the Penn Central Company (parent of the Debtor), and the preferred shareholders of the Pennsylvania Company all actively oppose the proposed settlement. At least partial opposition has also been expressed on behalf of the Detroit Bank, one of the original participants in the loan transaction, which has not accepted the proposed settlement agreement.

All facets of the proposed settlement have been fully explored through discovery, and extensive hearings have been held in this Court. Upon consideration of the entire record, I now enter the following

## FINDINGS OF FACT

1. Pursuant to credit and pledge agreements entered into in the spring of 1969, by the Debtor and 48 banks acting through the First National City Bank of New York as the agent bank, the banks made available to the Debtor a $300 million revolving line of credit to be secured by the Debtor's common stock interest in Pennco. Appropriate promissory notes were executed to reflect the principal and interest attributable to each drawdown.

2. Five additional banks acquired participation under the credit and pledge agreements.

3. By June 21, 1970, the full credit line had been utilized, and in accordance with the pledge agreement, the agent held the Debtor's stock certificate for Pennco's common stock accompanied by a stock assignment executed in blank. Paragraph 6 of the pledge agreement authorized the agent, upon default on the notes, to sell the Pennco stock to satisfy the obligations reflected by the promissory notes.

4. The Trustees have made no payments on the promissory notes. Accrued interest on the respective promissory notes to June 21, 1970 was $4,495,653, and simple interest since June 21, 1970 to October 31, 1972, is approximately $42.5 million.

5. The agent has declared the notes in default and accelerated the entire principal. By the general injunctive provisions of Order No. 1, the agent is enjoined from exercising its rights under the pledge agreement. However, Order No. 10 precludes the Debtor from causing Pennco to declare and pay dividends to the Debtor and, in addition, grants the agent certain rights to information concerning Pennco's operations.

6. Pennco is a Delaware corporation formed in 1870 by the Debtor's corporate predecessors to operate certain leased lines west of Pittsburgh, Pennsylvania. At the present time, Pennco is primarily a holding company for both rail and non-rail assets.

7. Pennco's outstanding common stock of 4,985,000 shares is owned by the Debtor subject to the pledge agreement mentioned in Findings 1 and 3.

8. Pennco's 206,440 preferred shares are publicly held and traded on the New

York Stock Exchange. The preferred shares have the following rights:

(a) Annual cumulative dividends of $4.625 per share.

(b) A liquidation preference of $100 per share prior to any payout to common stockholders.

(c) An option to convert the Pennco preferred shares into common stock of the Norfolk & Western Railway Company ("N&W").

9. Pennco has escrowed 158,248 shares of N&W stock to satisfy the conversion option of the Pennco preferred. As of January 1, 1972, five quarterly preferred dividends had been missed, amounting to a total cumulative arrearage in excess of $1.35 million. On January 15, 1972, preferred dividend payments were resumed.

10. Pennco's principal assets are described briefly below.

### Non-Rail Assets

(a) Arvida Corporation is a Delaware corporation conducting a land bank and development enterprise in Florida. It owns $24.3 million in interest-bearing mortgages and contract notes, 30,000 acres of raw land in Florida, and the Boca Raton Hotel complex. 58.4% of Arvida's common stock is owned by Pennco. The remainder of the stock is publicly held and traded over-the-counter.

(b) Buckeye Pipeline Company, an Ohio corporation, is wholly owned by Pennco and is engaged in the operation of oil and petroleum product pipeline systems in nine eastern and mid-western states. The stock of Buckeye is pledged to secure a $35 million loan to Pennco.

(c) Clearfield Bituminous Coal Corporation ("Clearfield"), a Pennsylvania corporation, is wholly owned by Pennco. Essentially, it is a passive enterprise managing mineral rights in coal-rich lands and debt and equity securities of other corporations, including railroad companies related to the Debtor.

(d) Great Southwest Corporation ("GSC"), a Texas corporation, conducts business on its own account and through certain subsidiaries and partnerships. Its main capital ventures are amusement parks, real estate holdings, including an industrial park, and the manufacturing of mobile homes. Exclusive of Pennco's ownership of 81% of the common and 82% of the preferred stock (90% of the voting stock), GSC stock is traded over-the-counter.

(e) Fifteen percent of the common stock and $32.9 million in convertible debentures of the N&W, a major rail carrier in the east. Ninety-eight percent of Pennco's N&W stock is pledged to secure various Pennco obligations. The ICC has ordered divestiture of the N&W holdings by 1979.

(f) Six percent of the common stock of Madison Square Garden in unregistered form.

(g) Sixty percent of the outstanding preferred stock of Strick, Incorporated, and warrants to purchase 27% of Strick's common.

(h) A subordinated note, due in 1978, in the amount of $2,661,000, plus accrued interest of $612,500 as of March 31, 1972, of Transport Pool Corporation, which leases trailers and is an affiliate of Strick.

(i) Sixteen percent of the outstanding common stock of Pullman Company.

(j) Two-thirds of the common stock of Penn Towers, Inc., the owner of an apartment building in Philadelphia.

(k) Seven percent of the 4½% preferred stock of the Wabash Railroad.

### Assets Related to Debtor's Rail Operations

(l) 245,329 shares of the 245,333 outstanding shares of the Detroit, Toledo & Ironton Railroad Company.

(m) Fifty percent of the common stock of the Toledo, Peoria & Western Railroad Company.

(n) Fifty percent of the common stock of the Montour Railroad Company.

(o) Seventy-four percent of the common stock of the Connecting Railway Company.

(p) Thirty-five percent of the common stock of the Philadelphia, Baltimore & Washington Railroad Company (the Debtor owns the remaining common stock).

(q) Twenty-eight percent of the common stock of West Jersey & Seashore Railroad Company (the Debtor owns 57% of the common stock of WJS).

(r) Through Pennco's wholly-owned subsidiary Clearfield, 40% of the common stock of the Cambria & Indiana Railroad Company, 30% of the common stock and 2% of the preferred stock of the Fort Wayne & Jackson Railroad Company and slightly less than 1% of the stock of the Mahoning Coal Railroad Company (a majority of the outstanding stock of which is owned by the Debtor).

(s) In addition to the above stock interests in railroad companies, Pennco has debt obligation of railroads as follows:

(i) A $20,305,000 principal amount open account indebtedness plus interest against American Contract Company;

(ii) A substantial number of bonds of the Lehigh Valley Railroad Company in unpaid principal amount of $3,166,000;

(iii) A $2,225,000 principal amount open account indebtedness plus accrued interest against the Detroit, Toledo & Ironton Railroad Company.

### Obligations of the Debtor or its Subsidiaries to Pennco

(t) A $49 million principal amount 9¼% promissory note of the Debtor to Pennco.

(u) A $33,176,893 principal amount open account indebtedness owed by PB&W to Pennco.

(v) General mortgage bonds of the Pennsylvania Railroad Company in principal amount of $11,637,000.

(w) $3,194,000 in principal amount of 5% general mortgage bonds, Series D, due August 1, 1975, of the Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Company.

11. Upon ratification of their appointments by the Interstate Commerce Commission on July 28, 1970, the Trustees were required to direct immediate attention to the financial condition of Pennco and its subsidiaries. In particular, GSC was in need of a substantial cash infusion within the near future. Moreover, effort was expended to secure new management personnel for Pennco and its subsidiaries to replace the Debtor's personnel that had provided the major management component for Pennco and its subsidiaries prior to the filing of the reorganization petition.

12. The Trustees have succeeded, in large measure, in eliminating or at least reducing the intensity of the financial and management problems of Pennco and its subsidiaries.

13. Within the first few months of their appointment, the Trustees determined that as a general policy it would be in the best interest of the estate to divest nonrailroad assets, if appropriate terms and methods were available.

14. Within this early period the Trustees' financial advisor, Mr. John Guest of Kuhn, Loeb & Co., proceeding on the premise that the value of Pennco was less than the $300 million debt which the Pennco stock secured, undertook to explore the possibility of the sale or transfer of the Debtor's Pennco stock to the lending banks. In March of 1971, a formal meeting was held between the agent bank and the Trustees. As a result of this meeting, a negotiating team was appointed by the Trusteees. Prior to the March meeting and thereafter, the Trustees were advised by their financial advisor and staff that the value of Pennco, and therefore the Pennco stock, was substantially less than the $300 million debt owed to the lending banks.

15. A number of studies compiled by the staff of Pennco, its subsidiaries, or retained advisors, were in existence during the period mentioned in Finding 14. These studies were relevant on the ques-

tion of the value of Pennco. These reports were not specifically relied upon by the Trustees in formulating their decision to enter into negotiations with the lending banks.

16. On May 25, 1971, a summary of points of agreement was executed (Document No. 1590) by almost all of the banks and the Trustees subject to the necessity of drafting a more formal agreement satisfactory to the parties and the eventual approval of this Court. A formal agreement was executed on March 14, 1972. Since that time amendments to the original agreement have been executed. It is this agreemnt, as amended, which the Trustees seek authority to implement.

17. Prior to execution of the settlement agreement, the Trustees authorized Kuhn, Loeb & Company to perform a formal appraisal study of Pennco to determine the value of the Pennco Stock. The final written report was rendered on July 17, 1972.

18. Kuhn, Loeb's appraisal of Pennco is summarized below:

| | |
|---|---|
| Investments in companies other than PCTC and its leased lines | $360,764,000 |
| Investments in PCTC and its leased lines | 28,292,000 |
| Pennco assets other than investments | 756,000 |
| Total assets and investments | $389,813,000 |
| Less: | |
| Pennco liabilities and preferred stock | 166,688,000 |
| Net value of Pennco stock | $223,125,000 |

Mr. Guest of Kuhn, Loeb made adjustments to the appraised value of certain assets in an affidavit dated November 3, 1973; however, the aggregate appraised value of Pennco was described as not appreciably more than $223,125,000.

19. Pennco rail assets as defined in the settlement agreement were valued at $68,936,000 and included in the total appraised value of $223,125,000 (Findings 10(l)–(s)).

20. During the preparation of the Kuhn, Loeb Report ("KLR"), additional information and data was generated by Pennco, its subsidiaries, and its retained advisors. This information was not necessarily reflected in the Kuhn, Loeb Report. Further information became available subsequent to Kuhn, Loeb's rendering of its final report.

21. The settlement agreement was executed by 49 of the 53 lending banks. Three of the non-signatories to the settlement agreement executed an amendment to the credit and pledge agreements which purports to alter the general security interest of the non-settling banks in all the Pennco stock to a security interest in $4\frac{1}{3}\%$ of the Pennco stock. The National City Bank of Detroit has not executed the settlement agreement or the modification to the credit and pledge agreements.

22. The settlement agreement, if consummated, would result in the restructuring of the legal rights of the settling banks in the Debtor's estate. In addition, specific obligations would be assumed by the Trustees and the settling banks to cause Pennco to execute certain transactions.

23. The rights of the Trustees and settling banks under the settlement agreement are summarized below:

(a) The Trustees will transfer to the settling banks or their nominee ownership of $95\frac{2}{3}\%$ of the Pennco stock.

(b) Cancellation by the settling banks of their claims arising under the credit and pledge agreements in the amount of $287 million plus all interest claims.

(c) The settling banks agree to make available $150 million in equipment financing within three years, of which $80 million is available to rebuild old equipment.

(d) The settling banks agree not to dispose of their Pennco stock (except if required by law) within five years of the closing date to any entity other than the banks' parent or a subsidiary of the par-

ent. If such a transfer takes place, it must be subject to the terms of the settlement agreement excluding the obligation to make equipment financing available. The settling banks would remain obligated to provide the equipment financing.

(e) The settling banks agree to share equally with the Debtor's estate any increment in the value of Pennco within 10 years of closing in excess of $287 million. All distributions and dividends from Pennco to the banks, and the appraised value of Pennco on the tenth anniversary of the closing date shall be considered in determining whether the $287 million figure is exceeded. Although this provision is denominated as the "equity split," the sharing arrangement does not give rise to any joint venture or partnership relationship between the Debtor and the settling banks.

24. Obligations of the Trustees with respect to Pennco:

(a) Cause Clearfield to transfer to Pennco its stock interest in the Cambria & Indiana Railroad Company, Fort Wayne & Jackson Railroad Company, and the Mahoning Coal Railroad Company.

(b) Cause the formation of a Delaware corporation to be known as "Pennrail" with the common stock to be owned by the Trustees and with nine series of preferred stock authorized.

(c) Cause Pennco to transfer to Pennrail the stock interests mentioned in subparagraph (a) of this Finding and the Pennco stock interests set out in Finding 10(l)–(g), in exchange for one series of Pennrail preferred for each of the nine stock interests in railroad property transferred to Pennrail by Pennco.

(d) Cause Pennco to subject the Pennco rail assets and Pennrail preferred stock to liens in favor of the Secretary of Transportation in an amount not to exceed $13.01 million as partial security for payment of the $100 million in trustees' certificates issued pursuant to Order No. 124. Said lien is subordinate to existing liens on Pennco's assets and the rights of the Pennco preferred stock.

25. Obligations of the settling banks with respect to Pennco:

(a) Cause Pennco to transfer the Pennrail preferred stock at any time to Pennrail for $50 million in cash or securities, including reorganization securities.

(b) Upon redemption of one or more of the series of Pennrail preferred stock aggregating a redemption price of $50 million, the banks will cause Pennco to transfer the remaining preferred stock of Pennrail to the Trustees for no additional consideration.

(c) Cause Pennco to transfer to Pennrail the preferred stock of Pennrail if at any time during the 10-year period the Trustees shall be entitled to payment pursuant to the so-called equity split provision. In the event the total distributions and appraised value of Pennco at the end of the 10-year period do not equal $287 million, the Trustees shall cause Pennrail to transfer assets of Pennrail to the banks in such amount not to exceed $50 million that is necessary to make up any deficiency, provided that in the event Pennco sells certain assets denominated as "special assets" (See Findings (t)–(w)) and sustains a capital loss, the tax savings generated and used by Pennco shall reduce the maximum amount of the Pennrail assets due the banks in like amount. In the event Pennrail assets are transferred to Pennco to make up any deficiency, (1) the Trustees have an option to reacquire said assets with cash, property, or securities (including reorganization securities) in value equal to the value of the asset reacquired; (2) the settling banks agree to execute the necessary documents and instruments to permit the Trustees to exercise management control over any of the railroad companies mentioned in Finding 10(i)–(r), if such control were vitiated by Pennrail's transfer of the stock underlying the Pennrail preferred to Pennco, and the railroad company is necessary for the operation of the Debtor's system.

(d) Transfer upon request of the Trustees the $33,173,893 debt owed by

the PB–W to Pennco for cash or senior debt reorganization securities in like amount.

(e) Will not cause Pennco to declare or pay any dividend or distribution to the banks for five years from the closing date.

26. Finding 10(a) sets out the main assets of Arvida. The KLR determined Arvida's asset value to be $98.4 million. The average market price of Arvida stock during the first six months of 1972 was $13.85 per share, or a total value of Arvida of $83.7 million. Similarly, the closing bid price of Arvida stock on June 30, 1972 and November 3, 1972, results in market values of $74.1 million and $68.7 million, respectively. Since the asset value was calculated on the highest and best use of Arvida's raw land, KLR concluded that the asset value was too high, but it also determined that the market price of Arvida stock was somewhat low. The report adopts a composite valuation of $87.5 million. The Debtor's stock interest of 58.4% was determined to be worth $51.1 million.

27. In calculating Arvida's debt, KLR made no discount adjustment based upon the relatively low rates payable on Arvida's major debt obligations.

28. Excluding Arvida's Boca Raton Hotel complex, the thrust of Arvida's operation has been land acquisitions for resale in large tracts. Arvida has recently determined to reorient its corporate activities to development of a significant portion of its inventory of raw land.

29. Land investment is a speculative and high risk venture. Land development, while potentially very profitable, brings increased risks by injecting entirely new marketing and production problems which to some extent are not within the control of management. From the point of view of undertaking land development objectives, the quality and location of Arvida's land inventory provides a strong base, as does Arvida's reputation for quality and fair dealing.

30. By moving into land development, Arvida must now consider potential outright sales from the competitive impact that such sales might have on Arvida's projected development undertakings.

31. Absent the change in Arvida's corporate objectives, Arvida could probably generate future cash needs itself. Land development objectives require additional financing. It is possible that Arvida will need Pennco support to secure the necessary additional capital.

32. Increased citizen and local governmental resistance to land development poses the potential of delays and even the halting of development of particular tracts within Arvida's inventory.

33. Pennco has strengthened Arvida's management; however, additional qualified personnel appear to be necessary to staff the company for its move into the land development field.

34. Arvida's dividend policy has been to forsake dividends in favor of reinvestment of earnings in the enterprise.

35. Because Arvida's earnings in the past have been a direct result of the number of large tract sales consummated, its earnings record has fluctuated greatly: the first nine months of 1972—pretax $4,946,000 posttax $2,470,000; 1971—pretax $3.3 million, posttax $1.825 million; 1970—pretax $0.2 million, posttax $0.1 million; 1969—pretax $2.3 million, posttax $1.3 million.

36. A five-year business plan has recently been developed by Arvida's management. The function of the plan was to state tentative operational objectives. Intensified development activity is reflected in the business plan by the rising numbers of units to be sold in future years.

A chart from Arvida's five-year plan has been omitted to protect confidentiality.

37. Acquisition of 1,306,733 shares of Arvida by Pennco would increase Pennco's interest to 80%. As an 80%-owned company of Pennco, Arvida could file a consolidated tax return with the Debtor's affiliated group, and thereby take advantage of the debtor's capital losses to shelter Arvida earnings.

38. It is estimated that if Pennco increased its ownership of Arvida to 80%, the value of Pennco's investment in Arvida would increase by about $50 million. It is estimated that acquisition of this large block of Arvida stock would cost at least $20 million (net $30 million).

39. Finding 10(b) describes the general business operations of Buckeye. The KLR values Buckeye at $80 million based on a 13.8 multiple of 1971 pro forma after-tax earnings of $5.79 million. The rather low earnings multiple is a consequence of Buckeye's low compound revenue growth rate during the last 10 years of 4.7% and a 5.7% compound revenue growth rate for 1966 through 1971. The average growth rate for earnings during the last 10-year period was 3½%.

40. The KLR evaluation resulted from a restatement of Buckeye's financial results in the last decade as a separate taxpayer (i. e., not part of the Debtor's affiliated group filing a consolidated return) and contemplates similar tax status in the future. Assuming Buckeye's income was offset by losses of the Debtor, the present value of the estimated tax savings through 1981 with a 7.5% discount rate is approximately $45 million.

41. Buckeye's 10-year forecast projects average pretax income in the $13 to $15 million range.

42. Assuming Buckeye is a separate tax entity in the future and its earnings forecast levels are accurate, Buckeye will be able to finance $97 million of capital expenditures, pay $6 million per annum to Pennco in dividends, and retire $57 million in debt during the next 10 years.

43. Buckeye is a well-established high-quality pipeline company competing in a unique environment in the sense that its customers frequently own their own pipeline ventures.

44. Buckeye's pricing and marketing policies have been relatively conservative. Pennco has recently replaced many top and middle management personnel in order to create a more aggressive and growth-oriented management philosophy.

45. Finding 10(d) describes the general business activities of Great Southwest Corporation ("GSC"). The KLR as supplemented, values GSC at $18.4 million. On that basis, Pennco's 82% ownership of GSC's preferred stock is worth $13.9 million. In addition, a $12.2 million debt obligation of GSC to Pennco is valued at its face amount.

46. GSC reported earnings of $28 million in 1968, $34 million in 1969, and a loss of $147 million in 1970. Pursuant to a consent decree entered into between Pennco, GSC, and the Securities Exchange Commission, certain transactions involving the syndication of Six Flags over Texas and Six Flags over Georgia which were originally treated as sales transactions and so reflected in the 1968 and 1969 earnings reports were recast as joint ventures with the entities previously treated as buyers. As a result, GSC's earnings were reduced by $14 million and $20 million in 1968 and 1969, respectively. The 1970 results were restated to decrease GSC's loss by $3.7 million.

47. The SEC mandated restatement resulted in a negative net worth of GSC of $20.8 million as of December 31, 1971.

48. Although Pennco has not formally restated its consolidated reports for the years 1968 through 1970, it is estimated that Pennco's pre-tax earnings would be reduced by $25 to $30 million in 1968, up to $35 million in 1969, and Pennco's 1970 loss would be reduced by $7 million.

49. Valuation of GSC on a going concern basis is difficult in light of the above earnings results, the recent elimination of substantial portions of the real estate holdings of GSC's California subsidiary, GSCDC-Western Region, and GSC's reordering of its corporate objectives from real estate development to concentration on its amusement park and mobile home operations. In general, KLR's appraisal method was to value the real estate holdings at market value and to value operating entities by an earnings multiple or going concern basis.

50. Up until mid-1972, GSC's ability to meet its debt as it came due was in serious doubt. During 1971, GSC was able to reduce its $287 million debt to $186 million. In March of 1972, an agreement was reached with a GSC creditor group under which new repayment schedules were established for $132 million of debt. Shortly thereafter, a refinancing of $34 million in debt of the recreation group was arranged.

51. New management has been selected to run GSC. Additional management personnel experienced in GSC's areas of activity are necessary.

52. GSC has extricated itself from the acute problems encountered in 1970 and 1971. Management forecast pre-tax earnings of $2.3 million in 1972 growing to approximately $15 million in 1977, with annual average earnings for the 1973–77 period of approximately $9 or $10 million.

53. A cash balance of $6.7 million is forecast for 1977.

54. During the 1972–77 period, GSC's debt will be reduced from $186 million to $81.5 million. Failure to meet revenue or earnings forecasts during the 1972–77 period by a few percentage points could result in GSC's being unable to meet its debt obligations during a given financial period.

55. GSC's business activities are conducted in three principal areas: The recreation group consisting of Six Flags over Texas, Georgia, and Mid-America Japanese Village and Deer Park in Buena Park, California; and the Movieland Wax Museum; Richardson Homes Corporation, a manufacturer of mobile home units; and GSC Development of Texas and GSC Development of California.

56. The recreation group properties are high-quality ventures that have been soundly operated and properly maintained. Competition is increasing within the amusement park industry. Aggressive marketing, additional capital investment, and the maintaining of the public's high opinion of the recreational group properties are necessary in order to maintain or increase the annual attendance levels at the respective properties.

57. The recreation group's 1972 revenues of approximately $50 million put GSC second only to Walt Disney Enterprises in the amusement park industry.

58. In evaluating the recreation group properties the KLR treated the properties as if they were owned outright by GSC. Six Flags over Texas and Georgia are not owned outright by GSC.

59. A GSC forecast projects pre-tax profits for the recreational group as follows: 1972—$9.9 million; 1973—$10.8 million; 1974—$16.8 million; 1975—$16.9 million; 1976—$19.7 million; 1977—$19.7 million.

60. Richardson Homes Corporation's 1971 production of 9,000 units places it in the top 15 companies in the mobile home industry. Recent competitive pressures have necessitated the marketing of additional models of Richardson Homes Corporation's product. Competition in the industry is intensifying. Recent trends indicate that large output companies are beginning to make it difficult for companies of Richardson's size to continue to hold or increase their market shares. Substantial capital investment to support internal growth, or acquisition of another mobile home company, may be advisable in the near future. A GSC forecast projects pre-tax profits for Richardson Homes Corporation as follows: 1972—$2.9 million; 1973—$2.8 million; 1974—$3.3 million; 1975—$3.8 million; 1976—$4.3 million; 1977—$4.8 million. 1972 results appear to be below the forecasted level.

61. Market prices for mobile home companies have decreased dramatically within recent months.

62. Sale of Richardson to a third party is complicated by its low book value of $6 million as compared with a $30 million appraised value on an earnings multiplier basis. The $24 million differential would probably have to be amortized as good will in future years.

63. GSC is a defendant in a number of pending lawsuits seeking recovery

from it of substantial damages for alleged violations of the federal securities laws and other claims. The amounts claimed in these lawsuits against GSC exceed GSC's total assets. The existence of these suits reduces significantly what an investor might be willing to pay for GSC. For a number of these lawsuits GSC has established a reserve of approximately $7 million on its books. GSC's management has determined that for the remaining lawsuits it is unable to determine its likely exposure and has been unable to establish a suitable reserve. A $20 million reduction in GSC's appraised value was made in the KLR to reflect the effect of the pending litigation.

64. Pennco owns 245,329 shares of the 245,333 outstanding shares of the Detroit, Toledo & Ironton Railroad Company, a railroad operating between Detroit, Michigan and Ironton, Ohio. The Ann Arbor Railroad Company, a wholly-owned subsidiary of DT&I (99.94% of the outstanding stock), operates a 293-mile railroad from Toledo, Ohio to Frankfurt, Michigan. DT&I Enterprises is a real estate subsidiary of DT&I owning 30 parcels of land along the railroad's right-of-way suitable for industrial development. DTI Enterprises also owns 60% of the stock of two railroad equipment leasing companies originally formed to lease equipment to the Pennsylvania Railroad.

65. Based primarily upon an earnings multiple of approximately nine times 1971 actual earnings of $2,467,000, as adjusted to $1,937,000 to reflect DT&I's filing of a corporate return without the benefit of Pennco's tax losses, the KLR valued DT&I at $18.4 million, or $75 per share.

66. A $2,225,000—6% 90-day demand note of DT&I which is technically in default but upon which DT&I has made interest payments is valued by the KLR at a 7% yield basis to be worth $1,929,000.

67. The 1972 forecast for DT&I's earnings is $2 million.

68. Although DTI Enterprises' real estate holdings are carried at a book value of $3.9 million and management estimates a maximum market value of $5.5 million, these assets were not specifically reflected in KLR's valuation of DT&I. Rather, the earnings multiple was derived from market prices of other railroad companies which also hold substantial real estate suitable for industrial development along their rights-of-way. Moreover, since DTI Enterprises did not declare a dividend in 1971, DTI Enterprises' value as a going concern to DT&I is reflected in the KLR only by its choice of an earnings multiple.

69. The Montour Railroad Co. is a terminal and switching company operating 47 miles of road in the coal area surrounding Pittsburgh, Pennsylvania. Montour originates coal shipments and interchanges with the P&LE, B&O, and the Debtor. Its real estate subsidiary leases coal rights. Royalty revenues will be approximately $500,000 per annum beginning in 1976. The Youngstown & Southern Railway Company is a wholly-owned subsidiary of Montour operating 50 miles of connecting road in Ohio. KLR values Montour at $4.06 million, with Pennco's 50% interest valued at $2.03 million.

70. The Toledo, Peoria & Western Railway Co. is 50%-owned by Pennco. It operates 240 miles of road outside Chicago and serves as a western connection for the Debtor. KLR applied an earnings multiple of eight to estimated annual earning power of $67,000 to arrive at a value of $5.36 million. Pennco's interest is therefore $2.68 million.

71. Cambria & Indiana Railway Co. is 40%-owned by Pennco's wholly-owned subsidiary, Clearfield Bituminous Coal Corp. C&I operates 38 miles of road in the coal region north of Johnstown, Pennsylvania, originating coal and interchanging it with the Debtor. KLR values C&I at 10 times projected earnings of $800,000 per annum, or $8 million. Clearfield's interest is valued at $3.2 million.

72. Clearfield also owns 30.5% of the common and 2.1% of the preferred stock

of the Fort Wayne & Jackson Railway Company which leases its 97-mile single-track road to the Debtor. No rentals have been paid since June 21, 1970, and the Trustees have recommended disaffirmance. KLR ascribes no value to the Fort Wayne & Jackson common stock and a value of $1,000 to its preferred stock holdings.

73. 138 shares, or 0.5% of the outstanding common stock of Mahoning Coal Railroad Company is owned by Clearfield. Mahoning leases its line to the Debtor. No rental has been paid Mahoning since June 21, 1970, and the Trustees have recommended disaffirmance. Although the stock was carried at a book value of $89,950 by Clearfield, KLR values Clearfield's interest at $23,000.

74. The West Jersey Seashore Railroad Co. is a non-operating company that leases its 197 miles of track to the Pennsylvania & Reading Seashore Line for an annual rental of $702,000. The Debtor and the Reading Railroad own 66⅔% and 33⅓%, respectively, of the Pennsylvania & Reading Seashore Line, and have guaranteed the Pennsylvania & Reading Seashore Line's rental obligation. The Pennsylvania & Reading Seashore Line is not profitable, but apparently indirect benefits to the Debtor and the Reading have resulted in the continuation of rental payments to the West Jersey. A multiple of eight was utilized in the KLR to arrive at a value of $5,561,500 for the West Jersey. In addition, the present value of projected real estate sales was set at $341,000. A total value of $5,902,700 was ascribed to the West Jersey, and Pennco's 28% interest was assigned a value of $1,660,000.

75. The Philadelphia, Baltimore & Washington Railroad Company's property is leased to the Debtor and serves as the Debtor's main line between Philadelphia and Washington. PB&W also owns various pieces of railroad throughout the Debtor's system that are also leased to the Debtor. Pennco's 34% interest in the PB&W is valued in the KLR at $12,-477,000. The so-called "15,000-mile core" would include almost all of PB&W's property. No rentals have been paid PB&W since June 21, 1970. Extrapolating the KLR value to a per-mile basis results in a $57,000 per-mile value ascribed to PB&W's road.

76. Connecting Railroad Company consists of relatively short sections of road around Philadelphia and Detroit, and between Cincinnati and Dayton, Ohio. In addition, Connecting owns the Little Miami Railroad Co. which operates between Cincinnati and Columbia, Ohio, and the Pittsburgh, Youngstown & Ashtabula Railroad which extends from New Brighton, Pennsylvania to Ashtabula, Ohio. These lines are leased to the Debtor, and substantial portions of the total trackage are included in the projected "11,000 and 15,000-mile cores." Pennco's ownership of 73.81% of the Connecting common was valued at $4,669,000 by the KLR report. On a per-mile basis the KLR report would result in a derivative value of $77,000 per mile.

### Discussion

### The Pennco Settlement Agreement

The settling banks have claims against the Debtor's estate in the total face amount of $287 million (plus pre-bankruptcy interest in the amount of $4.5 million), secured by a pledge of 95⅔% of the common stock of Pennco. (The validity of this pledge is challenged in related proceedings, referred to herein as "the Robinson Petition." For purposes of the present discussion, the validity of the pledge will be assumed.) The Trustees are apprehensive that the banks' claim may be entitled to post-petition interest; simple interest at 6% from the date of bankruptcy to June 21, 1973, would total approximately $55 million. The banks may further contend that, if the settlement agreement is not approved, they have the right to foreclose their pledge on the Pennco stock. And finally, if the settlement agreement is not approved, and if Pennco should

decline in value from its worth on June 21, 1970, it is possible that the banks will assert an administration claim against the Trustees for the decrease.

To summarize, if all of the banks' possible contentions set forth above are valid, failure to approve the settlement agreement would leave the Trustees faced with accumulating interest claims which already total nearly $55 million, the possibility that they will be held accountable for any decline in the value of Pennco, and the threat of foreclosure of the pledge, and possible further deficiency claims arising thereafter. The Trustees seek to avoid litigation of these issues, by carrying out the proposed settlement.

According to the Kuhn, Loeb report, the stock pledged to the settling banks is worth only $213.5 million. By transferring this stock to the banks pursuant to the settlement agreement, the Trustees would obtain the following benefits for the Debtor's estate: cancellation of the entire $287 million debt ($291.5 million including pre-bankruptcy interest); release of all claims for post-petition interest; avoidance of all risk of decrease in the value of Pennco; retention of operating control over the rail assets of Pennco plus an oportunity to acquire ownership of these rail assets on favorable terms; reasonable assurance that the banks will cause Pennco to be managed and operated in a way calculated to increase its value; reasonable assurance that, if the value of Pennco exceeds $287 million at the expiration of 10 years from the settlement date, the Debtor's estate will receive one-half of the increase; a three-year commitment by the banks to provide equipment financing up to $150 million (not more than $125 million outstanding at any one time), including $80 million available for financing rebuilt equipment. Certain features of the proposed settlement agreement require some elaboration:

1. *The Pennco rail assets.* These are divided into equity interests (Finding No. 10(1) to (r)) and debt interests (Finding No. 10(s)) in rail enterprises owned by Pennco. The settlement agreement is designed to insure that the banks get the economic benefit of these assets as part of the consideration for releasing their claims, but that the Trustees retain operating control, and have the right to get these assets back (without additional cost if the other assets of Pennco become worth $287 million within 10 years, and in any event for $50 million, payable in cash or in reorganization securities at face value). Bifurcation of operating control from economic benefit would be achieved through creation of a new enterprise, "Pennrail," to which nine blocks of equity securities representing ownership of various rail assets would be transferred by Pennco, in exchange for nine series of preferred income stock. The Trustees would exercise voting control of Pennrail to the extent necessary to control rail operations.

2. *Special Assets.* These are debt obligations which the Debtor or its affiliated companies owe to Pennco or its affiliated companies. They include $5.3 million in mortgage obligations of leased lines, $12.9 million in mortgage obligations of the Debtor or guaranteed by the Debtor, $54.1 million of unsecured obligations of the Debtor, and $33.1 million unsecured obligations of PB&W. The total face amount of these obligations is $106,507,999. As noted elsewhere in this Opinion, they are valued in the Kuhn, Loeb report at approximately $10.3 million. As to all of these special assets, the Trustees have the right of first refusal in the event of a sale by the banks. Apparently, payment in cash would be required. If any of these debt obligations is sold at a loss, reducing Pennco's tax liability, the reduction is to be credited toward reacquisition of the rail assets. In addition to the first refusal rights just mentioned, in the case of the $33 million unsecured obligation of PB&W, the Trustees have the option at any time to purchase this obligation, at its then value,

by payment either in cash or in senior debt reorganization securities at face value.

3. *The "Lock-Up" and "Equity Split" Provisions.* The banks would be precluded from receiving any dividends or other distributions from Pennco for five years. The banks would also be precluded from selling any of their Pennco stock during that period. Thereafter, until the expiration of 10 years, the banks would be free to dispose of all or part of their stock, and to receive dividends and other distributions from Pennco. At the expiration of 10 years, the banks' remaining holdings in Pennco (if any) would be valued. If the total of all dividends and distributions received by the banks plus the then value of their holdings in Pennco should exceed $287 million, one-half of the excess would be paid to the Debtor's estate, whereupon all rights of the Debtor's estate would terminate.

The agreement does not confer upon the Trustees any right to challenge any actions which the banks might take in dealing with their Pennco holdings or with Pennco's assets.[1] The agreement proceeds on the theory that Pennco should be completely divorced from the reorganization proceeding in order to facilitate development of its full potential; and that the banks should be free to exercise their own best judgment in the matter. By precluding the banks from liquidating their investment for at least five years, the parties apparently contemplate that, in their own self-interest, the banks would be encouraged to work toward the enhancement of Pennco values. While the banks would be free to sell their Pennco stock at any time after the expiration of five years, it seems probable that Pennco's growth potential during the second five years would be reflected in the sale price. Hence, it is probable that, if Pennco flourishes so that its value at the end of 10 years would be greatly in excess of $287 million, the Debtor's estate would reap some of the benefits, either because the banks, in their own self-interest, retained their investment for 10 years, or because the potential for growth during that relatively short five-year period would be reflected favorably in the price for which the Pennco stock would be sold during the second five years.

On the other hand, however, if Pennco's potential for growth is not manifested during the first five years, the banks could liquidate their investment and the Trustees would receive nothing. There is no particular unfairness in this feature, since such an eventuality would presumably demonstrate that the Pennco stock surrendered by the Trustees was actually worth less than the banks' claims against it.

The fact that the banks would own the enterprise outright after 10 years would seem to provide some incentive for retention beyond that period, unless there are significant negative developments in the interim. Obviously, it is not possible to predict what course the banks would choose to pursue. Changes in federal or state regulations might affect such decisions.

4. *Equipment Financing.* It is difficult to assess the full significance of this feature of the agreement. In the absence of government guarantees, the Trustees have had difficulty in financing equipment acquisitions, except under lease arrangements which are quite costly. It has been virtually impossible to finance the rebuilding of existing equipment, a process which can produce significant economies.

Under the terms of the proposed settlement agreement, the banks would be required, during the next three years, to make substantial equipment financing available, at an interest rate of 2¼ to 3 percent above the base rate charged by the agent bank to substantial and responsible borrowers. This composite rate would be variable, since the actual interest charge per quarter would be determined by the base rate applicable in that

---

1. "[E]xcept for acts of bad faith or wilfull misconduct. . . ." See § 4.02.

quarter. However, the commitment does not run in favor of the Trustees, but in favor of third party borrowers. Presumably, the lease between the Trustees and the financing entity would reflect a somewhat higher rate, to cover the intermediary's costs.

Initially, it was the position of the Trustees that this equipment financing, while desirable to have on a stand-by basis, might not be utilized, and was therefore not a particularly important feature of the settlement agreement. In the later hearings, this position changed, and it is now the view of the Trustees that it would be extremely desirable to have the benefit of the proposed equipment financing. Apparently, this is particularly true with respect to the $70 million available for rebuilding of existing equipment.

I have no doubt that this feature of the agreement would confer a significant benefit to the Debtor's estate. The importance of this benefit would seem to depend in large measure upon whether or not the required legislative and regulatory actions will be taken, so as to make possible the survival of the Debtor's railroad. *See* Order No. 1137. There is every reason to suppose that the government and the ICC are fully aware of the present obstacles to successful reorganization. Both oppose the settlement agreement.

■ As noted above, apart from the question of equipment financing and the equity split provisions, a principal advantage to the Debtor's estate, at least in theory, would be the relinquishment by the banks of all claims for post-petition interest. It would seem that the importance of this claim will vary depending upon whether or not the pledged stock generates income, and whether or not the value of the stock exceeds the amount of the banks' claims. The general rule in Chapter X and § 77 reorganizations seems to be that post-petition interest is not allowed. Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244 (1911); New York v. Saber, 336 U.S.

328, 69 S.Ct. 554, 93 L.Ed. 710 (1949). However, exceptions to this rule are recognized (1) when the instruments creating the security interests provide that the security applies to income as well as the asset in question, and the asset does generate income; and (2) when the value of the security exceeds the principal amount of the claim. Ticonic National Bank v. Sprague, 303 U.S. 406, 58 S.Ct. 612, 82 L.Ed. 926 (1938). However, these exceptions are not rigid doctrinal categories. A reorganization court must consider the issue of post-petition interest not in the abstract, but in light of the nature of each claim, and in application of basic principles of fairness and equity. Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946).

■ Claims for post-petition interest must be viewed in the context of the treatment accorded various parties secured by the same assets or assets; parties secured by different assets; and the treatment of secured parties in comparison with all other claimants and equity interests. The absolute priority rule of Northern Pacific Railroad Co. v. Boyd, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913) and its progeny bears on this problem.

To date, no one has attempted to create a procedural context in which the question of post-petition interest on the banks' claims can be squarely decided. About all that can be said at this point is that the banks' claim to post-petition interest is not clearly frivolous. The same observation applies to the contention that the banks might be entitled to assert administration claims in the event of a decrease in the value of Pennco, or at least would be entitled to be regarded as secured creditors to the extent of such decrease. *See* In re New York, New Haven & Hartford Railroad Co., 147 F.2d 40 (2d Cir. 1945).

The principal benefits to be derived by the banks from the consummation of the settlement agreement would seem to be these: (1) Elimination of involvement in

and uncertainty concerning the future course of this reorganization; (2) assurance that, at least for the most part, their claims will not be paid off in reorganization securities (*i. e.*, their investment will no longer be dependent to any substantial extent upon the future fortunes of the railroad business); (3) control and effective ownership of a highly volatile conglomerate with seemingly excellent potential for growth; and (4) an opportunity to foster the enhancement of the value of their investment, through prudent management, insulated from any stigma of bankrupty.

## *Valuation*

When the petition was filed, the Trustees also filed, and made available to the parties, a formal appraisal report prepared by Kuhn, Loeb & Company, in which the Pennco common stock was valued at $223,125,000 (Finding No. 19) (this report will hereinafter be referred to as KLR).

There is, of course, no established market price for the Pennco stock, all of which is owned by the Debtor. It was therefore necessary to apply various appraisal techniques in order to determine the price which a willing buyer would probably pay for the stock. Kuhn, Loeb determined that the highest value would be achieved by selling the constituent parts of Pennco to buyers in the same or related fields as the company in question, rather than by attempting simply to apply an earnings multiple to Pennco's average earnings in recent years. The latter approach was rejected because of the erratic earnings history of Pennco in recent years, and because it was felt that hypothesizing a sale of all of the Pennco stock to one buyer or syndicate would not produce as high a price as the aggregate of the prices of constituent companies. All parties appear to be in accord with the basic methodology adopted by Kuhn, Loeb.

Understandably, no other complete appraisal has been submitted by any of the parties. However, all of the supporting data were made available to the parties in the discovery process, and various parties do take issue with the judgments expressed in the KLR. These differences of opinion result in substantially different views as to the actual value of the Pennco stock.

The principal disagreement with the KLR is expressed in the Nydorf report, introduced by the New Haven trustee and relied upon by the government and the special representatives. Instead of attempting to determine the value of the Pennco stock in terms of the price that a third party buyer would be willing to pay for it, Mr. Nydorf attempted to determine the value of the Pennco stock to the Debtor's estate, if it were retained by the Trustees. The chief distinction between the two approaches stems from their differing treatment of tax shelters. Since KLR assumes sales to third parties who would not be able to take advantage of the Debtor's operating loss carry-forwards, historic and projected earnings of the various companies were restated to reflect independent taxpayer status. Thus, the KLR capitalizes pro forma after-tax earnings of the constituent companies. Nydorf, on the other hand, assumes retention of the Pennco stock by the Debtor's estate, and thus the continued availability of accumulated operating losses to shelter the income of the Pennco constituent companies. Generally speaking, this means that Nydorf capitalizes earnings at a level approximately 45 to 50 percent greater than that assumed by KLR. The Nydorf report takes a given tax liability shown on the restated earnings computation, treats the liability as cash available to the company, projects the tax liability for a period in the future, and then reduces the total tax saving to present worth by application of a discount favor. The present worth value of the future tax savings is then added to the appraised value ascribed to the company in the KLR.

Another difference between the two approaches is that KLR recomputed de-

preciation allowances in some instances to reflect a higher depreciation, on the assumption that that is what a third party purchaser would do. Nydorf, on the other hand, assumed that existing depreciation policies would continue to be followed.

The effect of Nydorf's "retained value" hypothesis is to increase the appraised value of Pennco by $163.5 to $177.7 million. Of this amount, $141 to $155.2 million is attributable to the present worth of tax shelters; $15 million arises from a downward adjustment in the depreciation allowances recomputed by KLR for Six Flags over Mid-America (reduced to present worth); and about $7.2 million results from certain additional value ascribed to DT & I Railway Company. The tax shelter figure is broken down as follows: Arvida, $30 million; Buckeye, $45 million; DT & I, $3.188 million; and Great Southwest, $62.8 to $77 million.

The Nydorf figures for Arvida are subject to a further qualification. Pennco does not own or control 80% of that subsidiary; hence, tax shelters generated by railroad losses are not available. The Nydorf report is based on the assumption that enough additional Arvida stock would be acquired to reach the 80% level. This would cost approximately $20 million, assumed to be available either in cash or through borrowings. The Trustees contend that the disadvantages of committing cash or credit to the acquisition of additional Arvida stock outweigh the theoretical tax shelter advantages.

In addition to the tax shelter adjustment made in the case of the DT & I Railway Company, the Nydorf report adds a further figure of $7.2 million to reflect additional values of its real estate subsidiary, DTI Enterprises. In valuing DT & I, the KLR applied an earnings multiple to DT & I's 1971 earnings. The multiple was derived from comparison with other similar railroads with substantial real estate holdings. Thus, the Trustees argue that the KLR fully recognizes the valuable real estate

holdings of DT & I, and that Mr. Nydorf's approach represents double valuation. Stated otherwise, the contention is that, using the Nydorf approach, the earnings multiple would have to be adjusted downward. The Nydorf supporters counter this argument by pointing out that in the year 1971, selected by the KLR as the basis for its valuation, the earnings flowing upstream from the real estate subsidiary to the DT & I Railway ($27,000) were unusually low.

The contrast between the KLR approach and the approach adopted in the Nydorf report points up a fundamental issue, namely, whether we are concerned with what Pennco is worth on the open market, or with what Pennco is worth to the Debtor's estate. In a straight bankruptcy, the relevant consideration presumably would be the price which Pennco could be sold for; that is, whether there is any "equity" over and above the banks' claims, and whether the Trustees should "disclaim". In a railroad reorganization context, however, the potential value of Pennco to the reorganized company must also be considered. In short, both the KLR figures and the Nydorf figures are relevant for present purposes.

However, the Nydorf figures cannot be accepted literally. It cannot be assumed that the savings available to the Pennco subsidiaries by reason of tax shelters would necessarily flow to Pennco, nor can it be assumed that whatever benefits do flow upstream to Pennco would be distributed dollar-for-dollar to the Debtor. Thus, while it seems clear that, by reason of the tax shelter feature, Pennco should be worth more to the Debtor than to a third party purchaser, the Nydorf attempt to quantify this difference cannot be regarded as entirely successful.

There was other evidence on the valuation questions. Mr. Robert S. Rubin of Lehman Brothers, the outside financial advisor to Pennco, testified on behalf of the Trustees that in his opinion, the maximum value could be attained by sale of Pennco's assets. He valued the

non-rail assets of Pennco at $184.5 million, and accepted a figure of $50 million for Pennco's rail assets. Thus, his total price of $234.5 million was $12.375 million, or .6%, higher than the KLR figure. Opponents of the proposed settlement point out that Mr. Rubin assigned higher values to certain of Pennco's assets than did the KLR, and lower values to other assets. If the Rubin figures and the KLR figures were combined, and the higher value used in each case, the total value of Pennco would be $257.125 million. Obviously, the validity of this approach is highly questionable. Moreover, Mr. Rubin did not engage in exhaustive examination of the underlying financial data and other material used by Kuhn, Loeb; his figures must be regarded as more or less in the "ball park" category.

A report prepared by McKinsey & Company must also be mentioned. In the latter part of 1970, when the Trustees secured outside directors for Pennco, the new members of the Board retained McKinsey & Company to make a quick study and report of the holdings of Pennco and possible methods of divestiture. After studying Pennco for only 3½ weeks, McKinsey & Company reported in general terms that if Pennco's assets were disposed of within a period of six months, Pennco would receive anywhere from $28 million to $170 million after its debts were paid; and that if a "managed divestment program" were undertaken over a course of two or three years, the return would be somewhere between $169 million and $320 million after Pennco's debts were paid. The report did not purport to include accurate valuations of the assets; values were stated as "order of magnitude" figures. In view of the wide ranges in these figures, the McKinsey report is not particularly helpful in the present controversy. It is to be noted that the McKinsey figures are not inconsistent with any of the estimates presented by the parties in this proceeding.

Further complications arise in connection with determining the amount of Pennco's indebtedness to be deducted from the asset values in arriving at the value of the Pennco stock, and in connection with the proper values to be assigned to certain "special assets" of Pennco, consisting of claims against the Debtor's estate or the Debtor's subsidiaries. In the KLR, the McKinsey report, and the analysis of Mr. Rubin, the debt obligations of Pennco and its subsidiaries have been taken approximately at face value, as were the liquidation preference rights of the Pennco preferred stock. In light of the distant maturities of some of the Pennco debt, and the low interest rates in some instances, the Pennco debt obligations are generally selling in the market at discounts. However, all parties except the New Haven trustee appear to have concluded that, if a divestment were actually to occur, the holders of the debt obligations and the deferred stock would be entitled to payment in full. And, of course, purchases on behalf of Pennco in the open market would require substantial cash outlays not now possible. ˙˙

A purchaser of Pennco's common stock would not necessarily reduce the asset values by the face amount of the debt, if continued operations of Pennco were contemplated which could liquidate the debt in due course. On the other hand, that same buyer would not necessarily adopt the asset values suggested in the KLR, because those values are designed to reflect the highest value of Pennco common stock (based on sales of constituent assets), and not necessarily the value of Pennco common stock to a purchaser who intended to continue Pennco in operation. In short, it appears that treating the Pennco debt at face value is consistent with the valuation approaches adopted by KLR, McKinsey & Company, and Mr. Rubin. It would be inappropriate to attempt to arrive at a value for Pennco by adopting the asset valuations of the KLR, but subtracting therefrom only the discounted values of the Pennco debt.

The "special assets" present different problems. Among the Pennco assets

which the banks would indirectly acquire through ownership of the Pennco common stock are approximately $13 million in mortgage bonds of the Debtor or guaranteed by the Debtor, $5.3 million in secured obligations of leased lines of the Debtor, and $87.3 million in unsecured claims agains the Debtor or its subsidiary, PB & W. The total face amount of these debt obligations is $106 million; the total value assigned to these assets in the KLR is $10.3 million. While it appears that no one questions the soundness of the $10.3 million valuation under present circumstances, the government and the special representatives point out that these assets may be worth substantially more if the underlying leases of the leased lines are affirmed, or when the terms of the reorganization plan are solidified.

It is impossible to predict what these special assets may be worth in the future. Since the interest rate on most of the mortgage debt is low, substantial reductions from face value can be anticipated. The Debtor's mortgage obligations, assuming the particular bonds are fully secured, would be entitled to favorable treatment in a plan of reorganization, in accordance with the absolute priority rule. Mortgage obligations of the leased lines present more difficult questions, in view of the fact that many of the underlying leases have neither been affirmed nor disaffirmed at this point. (However, of the $5.35 million in this category, about $2 million are in bonds of the Harlem; the Harlem lease has been affirmed by the Trustees, but the affirmance is being challenged on appeal.)

The likely future value of the unsecured obligations included among the special assets depends upon the degree of success achieved in the reorganization of the Debtor. The special assets include $54.1 million in unsecured obligations of the Debtor, and $33.1 million representing an unsecured advance by Pennco to PB & W. It should be noted that PB & W rail facilities form an integral part of the Debtor's rail system, and are included in both the 15,000-mile and 11,000-mile cores which have been projected by the Trustees.

The proposed settlement agreement contains redemption terms applicable to the special assets. If any special asset is sold by the banks, either to a third party or to the Trustees under their right of first refusal (or special redemption option applicable to the PB & W advance) any tax benefit resulting from the loss sustained by Pennco is, in effect, to be credited to the Trustees on the settlement date, through reduction in the amount of rail assets which may be subject to any deficiency claim. Thus, the Trustees would secure a benefit not otherwise available. Moreover, the proceeds from sales of special assets would presumably be reflected either in interim distributions, or in increases in the value of Pennco on the settlement date.

If the banks hold the special assets until reorganization, and are paid off in reorganization paper, the value of that paper at the time of the settlement date may be recouped, in whole or in part, by the Trustees through the equity split provision.

In the final analysis, it seems probable that the actual amount which the obligees of the indebtedness represented by these special assets will be required to pay in liquidation of their indebtedness will be significantly greater than the $10.3 million in value assigned to these assets; but it is impossible to determine the precise extent to which the increase will be reflected in the final distribution pursuant to the settlement agreement. That will depend upon (a) when the special assets are disposed of, in relation to the reorganization date; (b) whether the Trustees exercise their various options; (c) the relative success of the reorganization, expressed in terms of the kinds of reorganization paper which will be used to liquidate the underlying indebtedness; and (d) the length of time between the reorganization date and the settlement date under the agreement. This much is clear: It would be incorrect to view the present

settlement proposal as a transaction whereby the banks would acquire, for $10.3 million, claims against the Debtor's estate worth $106 million. $10.3 million probably represents the present worth of these claims, and if they later prove to be worth more, there is a reasonable likelihood that the Debtor's estate would receive a substantial share of the increase.

### The Government's Contentions

Pursuant to the Emergency Rail Services Act of 1970 (45 U.S.C. §§ 661–669) the government has guaranteed repayment of $100 million borrowed by the Trustees through the issuance of trustees' certificates. (*See* Order No. 124.) The government now contends that, by reason of the legal rights created by that transaction, the proposed Pennco settlement agreement cannot lawfully be consummated without the consent of the government. Two principal lines of argument are advanced in support of this proposition: (1) The lien of the trustees' certificates is some kind of a "super lien", not subject to the normal powers of a reorganization court to authorize sales free and clear of liens; and (2) in any event, the lien of the trustees' certificates cannot be divested from the Pennco stock as contemplated by the settlement agreement because there are no proceeds to which the lien can be transferred, nor any other provision for adequate substitute security.

■■ It should be noted at the outset that we are dealing with the lien of the trustees' certificates. Because they were to be guaranteed by the federal government, the enabling legislation was, of course, decidedly concerned with the quality and characteristics of the lien rights of certificate holders; but no attempt was made to create separate or independent lien rights in favor of the government, stemming from the govern-

ment's guarantee itself. In short, for present purposes, the government, as contingent obligor under the certificates, is seeking to protect the rights it would have as subrogee of the certificate holders in the event of default.[2]

Section 77(c)(3) of the Bankruptcy Act provides:

"The judge may . . . authorize the trustee or trustees to issue certificates . . . upon such terms and conditions and with such security and such priority in payments over existing obligations, secured or unsecured, or receivership charges, as might in an equity receivership be lawful."

As early as 1877, the Supreme Court held that the power of an equity court to subordinate first mortgage liens to claims under properly authorized certificates of an equity receiver was beyond question. Wallace v. Loomis, 97 U.S. 146, 162–163, 24 L.Ed. 895 (1877). *See* In re Prima Co., 88 F.2d 785 (7th Cir. 1937). Thus, trustees' certificates stand in sharp contrast to other kinds of debt obligations of a receiver or trustee, which, as administration claims, may be subordinate to claims of secured creditors in particular assets, unless they fall within an exception created for claims incurred for "preservation of the estate." 3A Collier on Bankruptcy, ¶ 64.02[2], 64.105 [1.4]; 3A Collier on Bankruptcy, ¶ 64.-102; 4A Collier on Bankruptcy, ¶ 70.99 [6]; 5 Collier on Bankruptcy, ¶¶ 77.02, 77.21; 6 Collier on Bankruptcy, ¶ 3.26.

Section 662(c) of the Emergency Rail Services Act of 1970 provides:

"(c) The Secretary shall not guarantee any certificate unless the certificate is treated as an expense of administration and receives the highest lien on the railroad's property and priority in payment under the Bankruptcy Act. . . ."

2. As a convenient locution, it has become customary throughout these proceedings to treat the government's claim as if the government had loaned $100 million to the railroad. Actually, of course, no public funds have been advanced to the railroad, and, in view of the priority accorded the trustees' certificates, the government's guarantee entails virtually no risk of loss.

In conformity with this requirement, Order No. 124 herein provides:

" . . . Each Certificate issued pursuant to this Order shall be treated as an expense of administration and receive the highest lien on the railroad's property and priority in payment under the Bankruptcy Act. As such, each Certificate will be payable in due course both as to principal and interest as an expense of administration by the Court of the property of the Debtor's estate and, without limiting the power of the Court to authorize additional obligations of equal priority herewith, is to constitute a charge and direct first lien upon all the property, real, personal and mixed, and the earnings and income thereof, now owned or hereafter acquired by the Trustees as such, said charge and direct first lien to be prior in right to the debts and obligations of the Penn Central Transportation Company, including, without limitation, the liens of each and every mortgage created by said company."

The provisions of the certificates themselves track this language.

■ There is nothing in the language of the statute, nor in the legislative history (see Appendix) to suggest that Congress intended a partial repeal of those portions of § 77 of the Bankruptcy Act dealing with the reorganization court's power to authorize sales free and clear of lien (in particular, § 77(o)). On the contrary, other provisions of the Emergency Rail Services Act seem clearly to negative the existence of any such veto power by the government over sales. For example, § 662(b)(3) requires the Secretary, as a condition of guaranteeing the certificates, to insure that "proceeds from the sale of assets will be devoted to the fullest extent possible to the provision of essential transportation services by the railroad." Section 662(b)(4) provides specifically for additional remedies in the event of default, and in the event of threatened cessation of rail services; even in the event of default, the government's control over the affairs of the railroad must be asserted by means of purchase or lease of the facilities (and the terms of such purchase or lease are subject to the approval of the reorganization court). And finally, § 662(d) provides that "in each case, the Secretary shall consider the feasibility of requiring the railroad to dispose of non-railroad assets as a condition to the guarantee." In compliance with this provision, the Secretary did in fact impose the condition that the Trustees promptly furnish a plan for disposition of non-rail assets, and the Trustees filed such a plan.

In short, it is clear that Congress intended to at least encourage, if not require, the Trustees to dispose of assets. It would be little short of ridiculous to conclude that, at the same time, Congress intended to deprive the reorganization court of the power to enable the Trustees to give clear title. If any such restriction had been intended, it would no doubt have been stated expressly. If any such restriction existed, it would have been difficult for this Court to make the necessary finding, in support of Order No. 124, that the issuance of trustees' certificates on that basis would have been in the best interests of successful reorganization. The fact is that no such limitation was even remotely contemplated by anyone when the trustees' certificates were authorized. Literally hundreds of property sales have been carried out during the course of the reorganization to date, without the slightest suggestion from anyone, including the government, that the lien of the trustees' certificates was not properly divested in each case.

■ The conclusion is inescapable that there is no merit to the government's "super lien" argument.

A more substantial obstacle to approval of the Pennco settlement agreement is presented by the argument that since there would be no "proceeds" from the transaction to which the lien of the trustees' certificates could be transferred, the lien cannot be divested from the Pennco stock in the absence of adequate

substitute security. While there is some suggestion in the legislative history of the Emergency Rail Services Act that the lien might be treated as inchoate until default (see, for example, Blanchette Memorandum, Appendix page 186), it seems clear that under the legislation as it was finally enacted, and under Order No. 124 of this Court and the provisions of the certificates themselves, the trustees' certificates do constitute a present first lien on all of the Debtor's assets, including the Pennco stock. Under familiar principles of marshalling, the certificate holders would be required to look for payment first to cash and other unencumbered assets of the Debtor before proceeding against encumbered assets. And a strong argument can be made that, at the very least, the lien of the trustees' certificates should be prorated over all of the. Debtor's assets, rather than asserted in full amount as to each asset.

But these are primarily questions of payment, and of the equitable treatment of liens in a reorganization plan. They do not necessarily justify the conclusion that the security of liens can thus be tampered with during the course of the reorganization, in the absence of a plan.

In the final analysis, it is clear that, as a condition to its guarantee of the trustees' certificates, the government exacted for the certificates security vastly in excess of the amount reasonably required for coverage. The question is whether, in such circumstances, an asset may be transferred to a junior lienholder in order to liquidate the junior debt at less than its face amount, in order to benefit (a) unsecured creditors, through reduction of the debt involved, and (b) the entire estate, through the probable enhancement of the value of the asset conveyed, with resulting residual benefit to the estate. This question does not often arise, perhaps because the oversecured creditor has no reason to object to transactions which pose no actual threat to his own security. However, in the present situation, the government declines to consent. It is indeed difficult to achieve a firm basis for present decision by forecasting the probable future outcome of application of marshalling principles. At first blush, it seems anomalous to say that the mere existence of a $100 million first lien precludes removal of any asset from that lien without substitution of equivalent security. The Trustees hold in escrow cash funds in excess of the full amount of the trustees' certificates, and the trustees' certificates are a first lien on these funds as well. But every other secured creditor having an interest in the escrowed cash would no doubt be in a position to argue that the assets securing his lien should bear no more than their fair share of the prior lien of the trustees' certificates. (Presumably, a fair share calculated after exhaustion of unencumbered assets.)

The proponents of the settlement apparently view the problem in terms of insuring proper allocation of administration claims, including the trustees' certificates, among all of the assets of the Debtor's estate. An amendment to the settlement agreement provides, in effect, that, in lieu of the government's lien on the Pennco stock, the government would obtain a first lien on the Pennco rail assets and Penn Rail preferred stock in an amount calculated to reflect the proportion which the value of Pennco bears to the value of the entire estate of the Debtor. The maximum amount of this lien would be $13.01 million, or 13.01 percent of any actual loss sustained by the government under the loan guarantee (this percentage was obtained by comparing a conservative estimate of the scrap value of the Debtor's estate, as set forth in the Trustees' Report of February 15, 1972, with the KLR valuation of Pennco). It may well be that this formula would give the government a greater residual stake in the Pennco assets than it would ever be entitled to under marshalling principles (for example, unencumbered and encumbered assets are lumped together, and only scrap values are assumed). At the very least, it seems eminently fair. But the basic

question remains: Does this Court have the power to divest the lien of the trustees' certificates from the Pennco stock, and require the government to accept the substitute security tendered?

■ I have concluded that in order to answer this question in the affirmative, it must appear, not only that the security of the lien of trustees' certificates would be otherwise amply secured (as is clearly the case here), but also that the proposed transaction would be so clearly beneficial to the Debtor's estate and its reorganization as to lead to the conclusion that failure to consummate the transaction would be decidedly detrimental to the Debtor's estate and the Trustees' reorganization efforts. In short, I believe that the correct answer to the legal questions involved may depend, in large measure, upon the merits of the proposed transaction.

### Jurisdiction of the Court

Some of the parties opposing approval of the settlement contend that this Court lacks jurisdiction to grant final approval. This challenge is expressed in two related lines of argument: (1) Approval of the Pennco settlement is beyond the power conferred upon the Court pursuant to §§ 77(a), 77(o), and 27 of the Bankruptcy Act; and (2) The proposed transaction is equivalent to a partial reorganization plan, or a step in a reorganization plan, and therefore must first be submitted to the ICC. Stated otherwise, the argument is that the proposed transaction either cannot be carried out in advance of a plan of reorganization, or would unduly interfere with the later performance by the ICC of the functions assigned to that body under § 77.

The ICC itself makes the further argument that, at the very least, the proposed transaction should be submitted to the ICC so that it can make a preliminary determination as to whether consummation of the transaction would be likely to hamper the reorganization role of the Commission. In connection with this argument, it may be observed that the Commission has had available to it all of the information available to the other parties, throughout this proceeding; there has certainly been nothing to prevent the Commission from reaching and expressing its own conclusion as to whether consummation of the transaction would in fact be likely to interfere with its ability to fulfill its reorganization function. The Commission and all other interested parties participated fully in the hearings in this Court, and it is difficult to understand what could have been achieved by a duplicate set of hearings before the Commission. Moreover, as a practical matter, referral of the matter to the Commission for preliminary findings would have been tantamount to rejection of the proposed settlement, in view of the deadlines imposed by the settling banks.[3] It seemed highly undesirable to reject the proposed settlement solely on the basis of an untested assumption that it might ultimately be found to be legally impermissible. To put the matter another way, a preliminary conclusion by the Commission that the proposed transaction would unduly interfere with the proper function of the Commission in connection with a later plan of reorganization would have been subject to review in this Court. In view of the limited time available for final determination, it seemed desirable to telescope these two steps, and to have this Court rule on the legal issues involved, giving due weight to the views expressed by the Commission.

■ I turn now to the jurisdictional issues. The provisions of § 77(b)(1) through (b)(5) constitute the principal source of guidance for determining what a reorganization plan is. Of these, subsections (b)(1), (b)(4), and (b)(5) are mandatory, while (b)(2) and (b)(3) are permissive. It is apparent from these statutory provisions that a plan of reorganization is ordinarily an arrangement for restructuring the debtor's financial obligations with the result that

3. Record at 8052.

the debtor emerges as a viable entity capable of continued operation as a rail carrier, with sufficient earnings to defray operating expenses and make adequate provision for fixed charges. When such a plan has been achieved, the reorganization proceeding terminates. Clearly, the disposition of a single asset, such as the Pennco stock, does not fit within a literal reading of § 77(b).

However, on the basis of recent reorganization practice, it can be stated that the traditional, unitary, reorganization plan is not the only arrangement which can be considered a plan of reorganization under § 77(b). The New Haven reorganization contemplated a two-step procedure: In the first step, substantially all of the New Haven assets were sold to the Penn Central. The second step contemplated capital restructuring of the enterprise through transfer of the sale proceeds to a closed-end investment company, and distribution of the securities of the new investment company to the New Haven creditors. Notwithstanding some reservations about this approach expressed in In Matter of New York, New Haven & Hartford Railroad Co., 378 F.2d 635 (2d Cir. 1967), the Interstate Commerce Commission later specifically sanctioned the practice:

> "While it may be unusual to determine the value of the New Haven in advance of and separate from a complete plan of reorganization, such procedure is not prohibited by the terms of § 77, and it appears to be within our discretion to make such a finding." Pennsylvania Railroad Co.—Merger—New York Central Railroad Co., 331 ICC 643, 724 (1967).

The two-step reorganization plan procedure was approved by the Supreme Court, at least by implication. New Haven Inclusion Cases, 399 U.S. 398, 413, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970).

A somewhat similar multi-step type of reorganization is apparently under way in connection with the Boston & Maine reorganization. And the Penn Central Trustees have recently filed petitions (Documents Nos. 5151 and 5152) seeking approval of cessation of certain freight and passenger operations as steps in a plan of reorganization.

In determining whether the proposed Pennco settlement should be regarded as a step in a plan of reorganization, and whether approval by this Court would improperly impinge upon the functions to be performed by the ICC, it is necessary to analyze the statutory allocation of functions between the reorganization court and the Commission, and the reasons for such allocation. The Supreme Court, in the *New Haven Inclusion Cases, supra,* set forth the appropriate allocations as follows:

> "To the traditional equity jurisdiction of the bankruptcy court, § 77 adds the oversight of the Interstate Commerce Commission, the agency 'specially charged with the public interest represented by the transportation system.' The statute contemplates that '[t]he judicial functions of the bankruptcy court and the administrative functions of the Commission [will] work cooperatively in reorganizations.'

> "In structuring the cooperative endeavor of the agency and court, Congress 'placed in the hands of the Commission the primary responsibility for the development of a suitable plan' for the debtor railroad. As the Court said in Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co. [318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959,] 'The ratio of debt to stock, the amount of fixed as distinguished from contingent interest, and the kind of capital structure which a particular company needs to survive the vicissitudes of the business cycle—all these have been reserved by Congress for the expert judgment and opinion of the Commission, which the courts must respect. In the development of the plan of reorganization, § 77 also has accorded the Commission primary responsibility for determining wherein lies the 'public interest,' which does not refer generally to matters of public concern apart from the public interest in the

maintenance of an adequate rail transportation system, but includes 'in a more restricted sense,' concern for 'the amount and character of the capitalization of the reorganized corporation,' as well as the 'adequacy of transportation service, . . . its essential conditions of economy and efficiency, and . . . appropriate provision and best use of transportation facilities.' As is clear from the legislative history and § 77 itself, the deference to the Commission as an initiator of the plan of reorganization stems from the 'recognition by everyone of the advantages of utilizing the facilities of the Commission for investigation into the many-sided problems of transportation service, finance and public interest involved in even minor railroad reorganizations and utilizing the Commission's experience in these fields for the appraisals of values and the development of a plan of reorganization, fair to the public, creditors and stockholders.' " 399 U.S. at 431, 432, 90 S.Ct. at 2078, 2079 [citations omitted].

Three basic themes emerge from the Court's opinion: (1) The purpose of a § 77 reorganization is to produce a viable corporate enterprise capable of supplying adequate transportation services to the public; (2) efficient use of the transportation plant is directly related to the primary purposes of § 77; and (3) the value of the estate, measured primarily by earning power, and the resulting capital structure, are crucial to the long-term financial soundness of the reorganized enterprise.

 In the present case, the configuration of the Debtor's rail system is not affected by the settlement agreement.[4] No direct questions are presented relating to the earning power of the estate, or its resulting capital structure. It is true that an income-producing asset would be divested, but I am not persuaded that this fact alone is sufficient to warrant referral to the Commission. On this record, I conclude that the proposed settlement agreement would not constitute a step in a plan of reorganization, as that concept has been developed to date; and that approval of the agreement would not interfere with the Commission's performance of its statutory functions.

Smith v. Hoboken Railroad Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123 (1946) and Thompson v. Texas, Mexican Railroad Co., 328 U.S. 134, 151, 66 S.Ct. 937, 90 L.Ed. 1132 (1946), cited by the Commission, support the views expressed above. In both cases, judicial action terminating a carrier's contractual right to operate trains over another railroad was held to be an improper interference with the ability of the Commission to perform its statutory tasks. In neither case did the debtor's trustee initiate the action; rather, third parties contractually committed to making these rail lines available to the respective estates sought enforcement of their termination rights under the contract. In each case, affirmance by the Supreme Court would have resulted in the termination of rail services by the debtor, without Commission participation. The Court held that Commission approval was required, in order to prevent interference with the Commission's obligation to structure an adequate transportation system, and in order to avoid a departure from the strictures of § 1(18) of the Interstate Commerce Act.

 The Commission has argued in this case that § 77(e) requires it to make all determinations relating to the value of the Debtor's property. It is of course clear that all questions of value in connection with formulation of a plan of reorganization are properly committed, at least initially, to the Commission. But it does not follow that questions of value unrelated to a reorganization plan

---

4. It should be emphasized that the Commission has made no contention that prior to consummation of the settlement the Commission must exercise its regulatory function under the Interstate Commerce Act.

must be referred to the Commission. That much is clear from a reading of § 77(e) itself:

> "If it shall be necessary to determine the value of any property for any purpose *under this section,* the Commission shall determine such value and certify the same to the court in its report on the plan." (Emphasis added.)

In context, it is clear that the word "section" refers to § 77(e), and that this applies only to valuations for the purposes of a plan of reorganization. The Commission is required to report its value determinations "in its report on the plan." This reading is entirely consistent with the Supreme Court's analysis of the Commission's jurisdiction in the *New Haven Inclusion Cases,* cited above.

The Commission's special expertise relates to adequacy of transportation services and valuation of railroad properties and railroad securities. It can scarcely be argued that the Commission is peculiarly well qualified to value Buckeye Pipeline Company or Arvida; and, as noted above, the configuration of the Debtor's railroad and its ability to provide rail services would not be directly or significantly affected by approval of the settlement agreement.

Having concluded that the proposed transaction is not a step in a reorganization plan, and would not do violence to the proper allocation of functions as between the reorganization court and the Interstate Commerce Commission, I now turn to the related question of whether there is statutory authority for approval of the transaction by this Court.

Section 77(o) provides in part:

> "The trustee or trustees . . . shall determine . . . what other property of the debtor, if any, should be . . . sold during the pendency of the proceedings in the interest of the debtor's estate and of ultimate reorganization but without unduly or adversely affecting the public interest, and shall present to the

judge petitions . . . for authority . . . to sell any such property. . . ."

In In Matter of Penn Central Transportation Co. (Sale of Park Avenue Properties), 354 F.Supp. 717 (E.D.Pa., 1972), I expressed the view that § 77(o) authorizes the sale of income-producing assets, in appropriate circumstances, and is not limited to sales of wasting assets. I adhere to these views.

It is, of course, true that, under § 77(b)(5), sales of assets may also be accomplished in a plan of reorganization. Quite obviously, however, the two sections do not cancel each other out. Section 77(o) was clearly included in the Bankruptcy Act to enable trustees to dispose of assets in advance of formulation of a reorganization plan, when such action would be in the best interests of the debtor's estate and the reorganization proceeding. There is simply no reason for concluding that the Pennco transaction cannot be authorized under § 77(o).

It has been suggested that the Pennco settlement agreement is not a sale of assets. However, cancellation of a debt is generally viewed as consideration for a sale. For example, mortgage foreclosure sales are frequently consummated through the acquisition of the property by a mortgagee in exchange for a release of all or part of his encumbrance.

Moreover, § 77(a) and § 27 of the Bankruptcy Act provide further authority for this Court to approve the present petition. See In re Huntington & Broad Top Mountain Railroad & Coal Co., 213 F.2d 411 (3d Cir. 1954). And the broad authority granted a reorganization court to restrain enforcement of liens, § 77(j), must surely be read as authorizing approval of actions by lienholders falling short of foreclosure itself.

It should be emphasized that the foregoing discussion relates only to the question of whether this Court is empowered to approve the Pennco settlement agreement. In my view, the arguments which have been advanced to negative the ex-

istence of such power are more properly addressed to the question of whether that power should or should not be exercised in the particular circumstances. The latter question is discussed elewhere in this Opinion.

A basic problem throughout this reorganization has been the difficulty of carrying out the statutory scheme of § 77 in situations which were not clearly perceived when the statute was enacted. The meager decisional authority emerging from railroad reorganizations of the 1930's and 1940's provides only limited help in dealing with the financial, economic, and legal problems of the Debtor. Railroads reorganized during the Depression suffered primarily from overcapitalization which made them unable to weather downturns in the business cycle. Generally speaking, the solution was to hold the creditors at bay until better times arrived, and then to restructure the debt. The implications of § 77(o) were seldom litigated, probably because what was being reorganized in those days was a railroad, rather than a conglomerate such as the Penn Central.

The Trustees cannot proceed on the assumption that their task is limited to allocating among creditors the securities of a reorganized company. They have an obligation to the public to make every effort to preserve essential rail services. They simply cannot carry out the intent of Congress, as expressed on § 77, if they are precluded from making beneficial changes in the status quo until a reorganization plan is a reality.

■ On behalf of the Interstate Commerce Commission, it is argued that, since *any* significant change in the *status quo* may potentially affect the exercise of the Commission's statutory authority, all such proposals must initially be referred to the Commission. It should prehaps be noted that the Commission did not take this position in connection with the sales of the Park Avenue Properties, but rather supported the view that such sales were permissible under § 77(o), without Commission participation. Nor

has the Commission asserted this position in connection with a wide range of other transactions during the course of the reorganization proceeding. I am unable to derive from the Commission's argument any suggestion as to a possible dividing line between those matters which must be referred to the Commission, and those which may be disposed of by the Court. Apparently, this is to be decided on an *ad hoc* basis, by the Commission, after a transaction has been negotiated. I prefer to believe that the dividing line is established by the provisions of § 77; that is, reference to the Commission is required in the case of abandonments in connection with § 77(o) transactions, but not in connection with the sales of "other property"; and Commission reference is required for transactions constituting a part of a reoorganization plan.

By way of recapitulation: (1) When the Trustees seek approval of a transaction characterized as a sale, that judgment will be presumed to be proper; (2) Parties to the proceeding are free to address themselves to the merits of the petition or to contest the Trustees' view that a sale is involved; (3) If the Court finds upon consideration of the contentions and evidence of an opposing party that the transaction is a sale, the petition will be decided on the merits; (4) On the other hand, if it appears that § 77 would be more appropriately served by referral to the Commission, then that will be done. Thus, petitions can be handled in an orderly manner based on the specific facts of each case. My difficulty in the present case is that the Commission's position is stated in the abstract. As I have already pointed out, recourse to duplicate proceedings to test abstract points is not efficient, nor was it possible in this case.

*The Merits of the Proposed Settlement*

Having concluded that there is no clearcut, insurmountable legal obstacle to approval of these petitions, I turn now to the ultimate issue namely, whether the proposed settlement should be approved.

10000It would be difficult to imagine a more perplexing decision.

For the inescapable truth is that no one really knows how much the common stock of Pennco is worth; the best that can be hoped for is an educated guess within a fairly wide range. And, of course, no one knows what the future holds in store for Pennco. On the basis of the evidence presented, I am satisfied: (1) Valued as of mid-1972, the constituent elements of Pennco, if sold in an orderly way on the open market, would generate not more than $250 million after payment of Pennco debt; (2) Pennco is worth substantially more to the Debtor's estate than it could be sold for; (3) There is very little likelihood of any significant decline in the value of Pennco; and (4) it is more probable than not that Pennco will increase substantially in value, and will, in the long run, provide a significant source of income.

When the negotiations between the Trustees and the banks began, and the earliest understandings were reached, the proposed settlement was undoubtedly an excellent one from the standpoint of the Trustees. The continued financial stability of Pennco was very much in doubt, there were severe management problems, and Congress had strongly suggested the desirability of curtailing non-railroad involvements as expeditiously as practicable. The proposed agreement would enable the Trustees to concentrate on railroad activities, pay off a large group of creditors, eliminate as much as $75 million in potential unsecured claims (the difference between the assumed 1970 value of Pennco, and the amounts of the banks' claims), obtain much needed equipment financing, and at the same time retain the possibility of sharing in the future growth of Pennco.

The fact remains however, that under present circumstances the proposal is objected to by the federal government, the Interstate Commerce Commission, a substantial percentage of secured creditors, and the shareholders. If for no other reason than their source, these objections cannot be lightly disregarded.

The situation at present differs considerably from that which motivated the Trustees in negotiating the proposed settlement. In the first place, the Trustees' efforts to obtain skillful management of Pennco have been extremely successful, with the result that the enterprise is now much improved. Pennco now involves very little effort on the part of the Trustees and their staff, and poses no substantial likelihood of cash drain. The original approach of the Trustees in their reorganization efforts was to produce a viable railroad enterprise with few of the attributes of a conglomerate. Undoubtedly, that is still the goal of the Trustees, but it now appears that the very survival of the railroad will depend in large measure upon what action may be taken by Congress and the Executive Branch within the next few months. Under these circumstances, the plea by the government that approval of the proposed settlement be withheld until definitive governmental action has been taken has persuasive appeal.

Moreover, if the necessary statutory changes are not forthcoming, and this reorganization proceeding is destined to end in liquidation of the enterprise, notions of fundamental fairness might well dictate that all categories of creditors should have their rights determined in that context, rather than that the rights of one group of creditors be accelerated.

I am convinced that, notwithstanding the changes in circumstances which have occurred since the negotiations began, the proposed settlement represents a fair and reasonable adjustment of the issues involved, based upon a realistic assessment of the risks. But I do not believe that its advantages are so pronounced as to warrant approval at this time, over the objection of the federal government. And, although I have rejected the legal contention that the proposed settlement must be viewed as a step in a plan of reorganization, I am persuaded that, as a factual premise for the exercise of this Court's discretion, it would be helpful to have a clearer picture of the probable future course of this

reorganization than is available at the present time.

For these reasons, I decline to approve the proposed settlement agreement, but without prejudice to further consideration after the hearing scheduled for July 2, 1973, pursuant to Order No. 1137 herein.

A further factor should be mentioned. In related litigation ("The Robinson Petition") various parties have challenged the validity of the pledge of the Pennco stock to the banks. A decision of that litigation will be filed in this Court shortly. In view of the novelty and importance of the legal issues raised in that proceeding, it is to be anticipated that the decision will be appealed. The final determination of such appeals would undoubtedly have a considerable bearing upon the final resolution of the proposed settlement agreement.

## ORDER NO. 1189

And now, this 16th day of April, 1973, it is ordered that this Court declines to approve at this time the settlement agreement referred to in the various petitions of the Trustees (Documents Nos. 3960, 4077, 4624, 5010 and 5042), but without prejudice to further consideration of said petitions after the hearing scheduled for July 2, 1973 (Order No. 1137).

## APPENDIX

Excerpts from Hearings before the Committee on Interstate and Foreign Commerce House of Representatives and the Subcommittee on Transportation and Aeronautics, Ninety-First Congress, Second Session, on H.R.19953

Mr. Adams. Would you repeat that again please, Mr. Wirtz?

Mr. Wirtz. That the trustees are committed and the management are committed to a maximum practicable disposition of all of the nonrailroad assets which are subject to our control.

Mr. Adams. That is unanimous, Mr. Wirtz, among the trustees?

Mr. Wirtz. Yes, sir, it is without any even shade of difference of view.

Mr. Kuykendall. Mr. Chairman, may I follow this? I think this is the best way for us to explore this type of thing.

To what extent are you the Penn Central Transportation Co. legally a stockholder of the subsidiary? What is your legal status. You own 100 percent of the stock of the subsidiary.

Mr. Wirtz. There is in the attachment to the longer statement, Congressman, a chart on the whole thing, but I can give it quickly.

Mr. Kuykendall. I finally have become used to looking at this long organization chart.

Mr. Wirtz. The situation is this. There is the Penn Central Co. at the top of these charts. That is a holding company. It has a couple of other assets, but leaving that out for simplification it holds all of the stock of the Penn Central Transportation Co. We are the Penn Central Transportation Co., and it is the transportation company which is in bankruptcy at this point.

Now, below the Penn Central Transportation Co., in the context that we are presently engaged in, there is another principal corporate entity, the Pennsylvania Co., and we hold all of the common stock in the Pennsylvania Co. We do not hold the preferred stock. The preferred stock is publicly held.

We hold 100 percent of the common stock of the Pennsylvania Co. The Pennsylvania Co., in turn, has either 100 percent or controlling interest in a number of the subsidiaries to which there has been the most general reference.

Mr. Kuykendall. Will you yield for a question?

Mr. Wirtz. Certainly.

Mr. Kuykendall. What legal power does the Penn Central Transportation Co. have to cause the Pennsylvania Co. to divest? I am talking about generally what is the structure.

Mr. Wirtz. It is a completely pertinent question, just completely, and when I said a moment ago that ours is a policy of maximum practicable disposition,

there are really just two reasons for qualification.

We don't feel that we can responsibly sell properties subject to our control at a fire sale and take that kind of beating and that it would be a great mistake, and the other involves the point to which you have referred.

Almost all of these properties are heavily encumbered, heavily mortgaged.

Just as an illustration, we own 100 percent of the common stock of the Pennsylvania Co., but it is all pledged to the banks so that this is a real question, and this brings me to your particular question.

The answer to your question will have to be resolved over a period of time very possibly involving litigation of one sort or another, and there is no clear answer to the question which you put.

Mr. Kuykendall. How about your cashflow from your subsidiaries? When Mr. Saunders was here this was one of the things, to use a mild term, we raked him over the coals about, and that was the fact that the cashflow into the Penn Central Transportation Co. had been good and yet he had paid it to Penn Central Co., as a dividend, and in 2 years paid out $98 million.

Is the cashflow coming into the Transportation Co. still from the subsidiaries in a pretty good way?

Mr. Wirtz. It is zero.

Mr. Kuykendall. Why has it stopped?

Mr. Wirtz. For a variety of reasons. It was never simply a cash flow figure. If I may take a slight detour and then come back to the specific answer to your question, there has been a good deal of suggestion that a great deal more money went, as they say, downstream, from the transportation company to the nonrailroad companies than came back to it.

That is true, but it is not a complete comparison for this reason: When the Transportation Company went into this diversification policy as they did to a very considerable extent some of it reaching fairly far back but a great deal of it in the last 2 or 3 years since the merger, when they went into it, it was as part of an approach which paid off from the Transportation Company's standpoint largely in borrowing which the Transportation Company then did on the basis of the security represented by those investments downstream.

Now, I could answer your question very shortly and to my advantage, perhaps, under present circumstances by saying that there was a diversification policy and that it all went downstream or almost all of it, and that is part of our trouble, but that would not be a fair answer.

That is true as far as the form of your question is concerned. The cash went down and only a smaller part of it came back up and that is part of our trouble.

We think on hindsight the diversification policy was wrong, but it would be unfair to rest the answer to your question there because the rest of the story was that there was then borrowing from the bank which came to the Transportation Company, to us, on the basis of the credit and security which was reflected in some of those investments downstream in the Pennsylvania Co. and in the others but the net of the point, and I have tried to qualify my answer now, is we are not getting anything from that or substantially nothing from those assets at this point and on hindsight we think that policy was wrong, there were reasons for it at the time that can be argued and it will probably be litigated, but as far as we are concerned right now the only thing that makes sense is to find whatever values there are in that property, consistent with the interest which we have to recognize other interests in the reorganization procedure, and to realize on those values from the standpoint of the Transportation Company.

Mr. Adams. What is your projection through December 31, 1972?

Mr. Wirtz. We have lumped the next 2 years together.

Mr. Adams. In other words, 1972 and 1973 you have lumped together?

Mr. Wirtz. The answer to your question in those terms would be another $175 million to $150 million.

Mr. Adams. For 1972 or for 1972 and 1973 together.

Mr. Wirtz. The two together. I should add one footnote. We have made one assumption there that ought to be brought to your attention. Under present court order we are not paying local taxes. We have a very strong feeling that they represent the kind of claim which ought to be covered because it is for education and that kind of thing.

Mr. Adams. You are not paying local taxes?

Mr. Wirtz. We are not today.

Mr. Adams. That is not included in this figure, or is included?

Mr. Wirtz. That is an item of about $64 million a year and in answering both of your questions about 1971 and 1972 and 1973, those figures do include a factor of $64 million for the payment of local taxes.

Mr. Kuykendall. Annually?

Mr. Wirtz. Annually. $128 million for those 2 years.

Mr. Adams. That is for 1972 and 1973?

Mr. Wirtz. No; I am sorry. To cover the whole ground, so far for the 6 months of 1970 there has been a deferment of about $32 million in local taxes. Now, for 1971, local taxes would be about $64 million, and we have included those in our cash needs.

For 1972–73 you are right, Mr. Kuykendall, there would be another 128 million.

Mr. Kuykendall. That is included.

Mr. Adams. That is included.

Mr. Wirtz. That is included.

Mr. Adams. Now, if you want to consult with your attorneys, please do, or maybe you have thought this through. Under section 77, if the Government guarantees a trustee certificate, what is your statement to the committee as to the priority of claim of the U. S. Government in the event that the Penn Central defaults?

Mr. Wirtz. I have an answer and then ask that it be checked with Mr. Blanchette. I think the answer to that question will depend upon the terms which are identified by legislation for those certificates. But in general, the answer would be that they would be an absolute first claim and there is a real concern in our mind under the proposed legislation about their relationship to provisions for the financing of equipment..

I think there is a problem there that probably ought to be worked out, but my answer to your question in general is that depending upon the terms of the legislation, but answering in general they would be first claims.

Mr. Pickle. Would the gentleman yield for a question?

Mr. Adams. Yes, we will ask Mr. Blanchette and then yield.

Mr. Blanchette. That is correct, Mr. Chairman. Depending on the terms of the legislation trustee certificates normally comprise a first lien on the assets of the estate, subject again to this qualification with regard to equipment obligation.

Mr. Adams. And to wages, as I remember?

Mr. Blanchette. They would be payable as the railroad was operating as an expense of administering the trust estate so that they would be payable with wages.

In the event of a default, I would anticipate that the normal court would pay wages ahead of any lien of this nature, but that again can be argued.

Mr. Adams. That is the general way that it is done, and I would appreciate it if you would supply the committee with a memorandum on that point so that we know in terms of drafting potential legislation that we can represent to the Congress as the matter moves forward what the priority of the Government will be and the alternatives.

I, of course, cannot predict whether the Government wants to stand ahead or behind other creditors, but we would want to present it in the first instance that they would be in effect trustee or operating expenses so that the Government priority would be first.

Mr. Blanchette. That is right.

(The following memorandum was received for the record:)

Penn Central Transportation Co.,

*December 15, 1970.*

Messrs. George P. Baker, Richard C. Bond, Jervis Langdon, Jr., Willard Wirtz, Trustees.

Subject: Priority of trustees' certificates issued under guarantee of the United States.

*Background:* During the presentation of their testimony before the House Subcommittee on Transportation and Aeronautics on December 15, 1970, the PCTC Trustees were asked to summarize the status of Trustees' Certificates, issued under Government guarantee, in the reorganization proceedings.

*Conclusion:* The specific status to be accorded Trustees' Certificates would obviously depend upon the particular legislation under which the guarantee was authorized. It would also depend upon the terms of the Court decree which authorized the Trustees to issue the certificates.

In general, however, Trustees' Certificates rank ahead of all pre-bankruptcy obligations of PCTC, except equipment obligations which are granted special treatment under the Bankruptcy Act. Section 77(c)(3) of the Bankruptcy Act, for example, reads as follows:

"The judge may, upon not less than fifteen days' notice published in such manner and in such newspapers as the judge may in his discretion determine, which notice so determined shall be sufficient, for cause shown, and with the approval of the Commission, in accordance with section 20a of the Interstate Commerce Act, as now or hereafter amended, authorize the trustee or trustees to issue certificates for cash, property, or other consideration approved by the judge, for such lawful purposes and upon such terms and conditions and with such security and such priority in payments over existing obligations, secured or unsecured, or receivership charges, as might in an equity receivership be lawful. Where such certificates are authorized to provide funds to pay for the acquisition, assembly or installation of safety equipment or materials related thereto, or for the purpose of reimbursing the trustee or trustees for funds so expended, the judge may direct (without limitation of his power to make such direction in the absence of this provision) that the certificates shall have such lien on the property of the debtor and shall be entitled to such priority in payments over existing obligations, secured or unsecured, and receivership charges and present or future duties, debts or taxes or other obligations in favor of or payable to any State or any subdivision, agency or instrumentality thereof and interest or penalties, and to such parity with all or any portion of the other costs or expenses of administration or operation as in the particular case the judge may find equitable at the time of authorizing the issuance of such certificates, regardless of whether such obligations, charges, costs or expenses, duties, debts, or taxes constitute or are secured by liens on real or personal property or shall have become payable before or after the issuance of such certificates."

On current payment, this conclusion means that interest and principal are payable as an expense of administering the bankruptcy proceeding. As such, debt service ranks equally with other administration (postbankruptcy) expenses, such as payroll, freight loss and personal injury claims, and payments on equipment obligations.

On a hypothetical default, Trustees' Certificates usually are secured by a first lien on the assets of the estate (subject to later qualifications on equipment obligations). For this reason, repayment on Trustees' Certificates in default

188

would be a priority claim on those assets, payable ahead, for example, of bondholders' claims. How they would rank ahead of other postbankruptcy claims, notably employees' wages and Federal withholding taxes, would depend upon the decree of the Reorganization Court and applicable Federal law.

The Bankruptcy Act presently insures the integrity of equipment loans by preserving the right of repossession of the equipment in the event of default. The provision reads as follows:

". . . The title of any owner, whether as trustee or otherwise, to rolling-stock equipment leased or conditionally sold to the debtor, and any right of such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provisions of this section."—Bankruptcy Act Section 77(j).

Unless this protection is preserved, it is unlikely that the requisite legal opinions could be given to permit any future private borrowings for equipment.

Robert W. Blanchette,
*Counsel for Trustees,*

Mr. Kuykendall. In receivership, what is the relationship between that Pennsylvania Co. stock that is specially pledged to a bank, and the trustee certificate? In other words, may we legislate a first mortgage against that stock that is already pledged?

Mr. Wirtz. Yes, sir.

Mr. Kuykendall. In your opinion, Mr. Wirtz, we do have the authority, you think, to declare to the taxpayer, to whom we have to answer, that we are putting the U. S. Government's name on the best possible mortgage that can come from the Pennsylvania Co. Is this correct?

Mr. Wirtz. Yes, sir, without qualification.

Mr. Kuykendall. But if your legislation here was worded in such a way as to make that stock collateral directly on the trustee certificate then it would be direct protection for the taxpayer. Is this correct?

Mr. Baker. It certainly would.

I think we would have to ask counsel whether that is possible.

Mr. Kuykendall. This is the point I am trying to make. It is our job to justify to the taxpayer what we are thinking about doing. We need to see a direct access to assets by the taxpayer, and need to be able to show this to our colleagues on the floor of the Congress.

Mr. Blanchette. I am not sure I understand your question. If you are talking about the stock of the Pennsylvania Co., which is the largest subsidiary which is held by the trustees subject to a pledge, Mr. Wirtz has replied to that question.

If you are talking about the stock of Arvida, Buckeye pipeline—

Mr. Kuykendall. Which is not owned directly by the Transportation Company?

Mr. Blanchette (continuing). Which is owned by the Pennsylvania Co., it is not my opinion that you can reach those stock holdings of the Pennsylvania Co., directly without—I suppose courts have been known to pierce corporate veils.

Mr. Kuykendall. Mr. Wirtz, in my first question an hour ago, this was one of the things I was aiming at.

Are some of the most valuable properties not directly accessible because of the corporate veil of a subsidiary?

Mr. Dingell. I will ask unanimous consent that you be afforded unanimous consent to elaborate on this.

What, gentlemen, are the precise needs that you assert? Your present statement does not indicate support of this bill. What, if you can enumerate, are the precise needs that you gentlemen have in terms of governmental help, the minimum precise needs?

Mr. Wirtz. I think the answer to that, Mr. Dingell, is the $100 million by March 31. We broke that down in earlier testimony into months.

We cannot wait until March 31. If we run out of cash, we close in January.

By the end of that month, it is a $5 million deficit. That is just deficit. By the end of February it is about $40 million, and by the end of March it is about $68 million. That is without any cash left.

Mr. Dingell. That is all you need. You need essentially a Federal Government guarantee of trustees certificates. Is that correct?

Mr. Wirtz. Either that, or in some direct loan.

Mr. Dingell. Or a direct loan. What will the Federal Government get from this for its loan? What is the position of the Federal Government going to be?

Mr. Wirtz. A top priority?

Mr. Dingell. First priority?

Mr. Wirtz. First priority.

Mr. Dingell. Above and beyond any other earlier creditors?

Mr. Pickle. Will the gentleman yield?

Mr. Dingell. I will be glad to yield, in just a second.

Is it your position that the Federal Government should have first priority position above any annual creditors whose debts antedate that guaranatee?

Mr. Wirtz. The answer in general is, "Yes."

We have suggested, and there has been reflection of it in some of the questions by the committee, the advisability of a provision in the bill, and we have been asked to submit an amendment which would permit the prior claims when it comes to the financing of equipment, and the lien situation there. That is the only one.

Mr. Dingell. I will yield to my friend from Texas for a question.

Mr. Pickle. In that connection, are the rights-of-way and/or roadbeds of Penn Central mortgaged?

Mr. Langdon. Yes, they are heavily mortgaged, sir, and of course, we operate most of the railroad under lease, with perhaps 50 or 60 under lien companies, and we lease them.

We have a very complex corporate structure even in the operation of the railroad.

Mr. Pickle. If those roadbeds and rights-of-way are heavily mortgaged, what would be our right, if we made this loan, and we had to foreclose?

Mr. Langdon. It is my understanding, sir, that with the exception of equipment —that is, we would like to have that exception because of the special equipment needs of the Penn Central—that in every other respect the Government would come first.

Mr. Dingell. If Penn Central goes under with this Government guarantee, what will happen to Penn Central? Will it go into liquidation, or what are the options that will be available to the court?

I assume the court would make the decision. What would be the options if Penn Central goes under after they make the guarantee?

Mr. Wirtz. Are you talking legally, or practically?

Mr. Dingell. Either.

Mr. Wirtz. I think the answer is that you nationalize the railroad.

Mr. Dingell. Frankly, I don't intend to allow Penn Central to go under as an operating entity. I think that perhaps if it goes under, we probably are going to have to give very careful consideration to seeing to it that Penn Central is frankly nationalized, and the question then, what steps do we take to assure that the rights of all the people are fully and adequately protected with regard to retrieving at that point all of the assets.

Perhaps you can tell me that we can trust the courts, and perhaps we can, but I would like some comment on that point, and where we are going to go.

Mr. Wirtz. As a starting point, Mr. Dingell, we have been exploring this possibility thoroughly. We think it is a wrong answer, and part of the reason is that the bill for that answer would make

our present suggestion minimal by comparison. We are talking about assets which on a Government takeover basis would have to be picked up at a very high price.

May I improve this opportunity to say to you how important the point is that you are raising. You know there are interests in this reorganization which are strongly opposed to the position that we are taking here, and we are right now at the reason for that.

We think that the public interest is served by making the financial arrangements that are necessary to keep us going on as a going concern.

There are some creditors and some stockholders who would much rather see us nationalized, and all these properties liquidated for their protection, and we think that is wrong.

Mr. Dingell. So that we are clear on this, I want to see you folks make it, if you can. I don't want to see you nationalized, but if you cannot make it, then I am assuming that somebody is going to have to keep this organization operating, and the services provided, and the only one I could think of that we could trust to do that at this point would be the Federal Government.

Mr. Wirtz. That is right.

Mr. Dingell. What I am trying to do is see what the Federal Government's rights would be, if finally this thing goes down the drain, so that it would be able to keep this going, an operating entity, and I know of none that are in either of the bills now pending before us, and I am asking for your guidance.

Mr. Wirtz. Its rights would be completed. We would own it complete, and at the same time would have to pay out billions and billions of dollars for that right.

Mr. Baker. May I say something?

It seems if we run out of money and cannot get help from the Government, we stop operations just like a strike, and at that point the Government is faced with taking it over or not, or just having it liquidated. Presumably the Government takes it over and keeps it going.

As to the legal rights then of the Government recapturing what it has loaned, in a way, at that point, because this has become a loan if it had to make good on these certificates, I would like to hear from counsel, Mr. Blanchette.

Our understanding is that the Government at that point does not have any trouble in recovering whatever it loaned, in a way, because it is the first claimant, and it comes in under everybody else, but that may be too simplified, and I think it would help if Mr. Blanchette spoke to it.

Mr. Blanchette. The short answer, sir, is that the trustee certificates which would have been issued under the proposed legislation would constitute an offset to the purchase price by the United States, so that let's say there was $100 million of trustee certificates in default. Then the purchase price to the United States would be $100 million less than the court would otherwise adjudicate it to be, because the United States would be entitled to be paid first out of the assets, and since it is buying the assets, it would recoup it by way of offset.

Testimony of Secretary Volpe

Mr. Kuykendall. Mr. Secretary, before we convened I was discussing this with you and your staff, and I think we understand each other. Because of the necessity of our being able to sell this paper to our colleagues in the Congress and then ultimately to the taxpayer, I think you will agree that it is necessary that we be able to show a clear first mortgage on this property.

This is one of the reasons that I know that you moved away from the position of the first bill and went into bills pretty much on railroads in receivership so that we can look at trustee certificates which are first mortgages and, therefore, we feel like we can give a better shake to the taxpayer here in the form of guarantees.

I understand even the trustees of Penn Central don't use this organizational

chart, because it is too complicated. They use a simplified one. But one of the things that we want to be sure that we can do in writing this legislation—I know the gentleman from Washington agrees and the acting chairman professes some doubts.

For instance, the Transportation Company owns 100 percent of the stock in the Pennsylvania Co. and that stock is pledged to banks. This is, of course, a pretty brutal decision to make, but I think we, on this body, are going to have to make it, and that is to word language in such a way to be sure that even that property we do get a first mortgage on.

It is my opinion, and the opinion I know of these other two gentlemen, that it is going to require separate and specific language to be sure that we get first mortgage on previously pledged assets.

Secretary Volpe. Congressman, we would be very happy to furnish the committee with language which we believe will do that, which your staff I am sure will want to review. They may already have some language.

Mr. Dingell. If the gentleman will yield, I would like to advise my good friend and colleague that the chairman asks the staff to work with your people, Mr. Secretary, to achieve the kind of language Mr. Kuykendall has been discussing with you. I am sure you will give us the usual able cooperation.

Secretary Volpe. Absolutely.

Mr. Kuykendall. The second thing, are you familiar with the trustees' request this morning that this language we are speaking of does leave one exception and that is the right of the trustees to deal with equipment manufacturers for the purchase of new rolling stock and separate to finance them using the rolling stock themselves as collateral for their own purchases.

Are you familiar with and do you agree with this request?

Secretary Volpe. I am familiar with it. I think there are a variety of items that are going to bring that railroad out of reorganization, but one of them particularly is going to be giving better service. One of the ways in which they can give better service is to acquire better rolling stock. I would be in complete concurrence with that.

Secretary Volpe. A first mortgage loan.

Mr. Kuykendall. Are your lawyers of the opinion that this is a hopeless cause and we might as well forget that as a potential asset?

Secretary Volpe. Congressman, I think the answer to that is probably the same as the other. Jim Beggs, my Under Secretary, sat with the old management for many, many hours, and has sat also with the new trustees in an effort to try to really get at the guts of what this total operation was. Maybe Jim, who is not a lawyer either, but—

Mr. Kuykendall. If you will yield for just a moment, my train of questioning is aimed at trying to make the best case for this committee to carry to the floor and if we are going to carry to the floor partly an allusion that implies assets that are stocks in subsidiaries and when you get down to that subsidiary there is nothing left there but a shell and the assets used to pledge within that subsidiary are inaccessible to us, then it is nothing.

So if that is our position, we want to know it on the front end and not get caught on the floor in that position.

Mr. Beggs. Mr. Kuykendall, maybe I can shed some light on that. I might confuse it even further. All of the land holding companies are in the Pennsylvania Co., which as you stated, is 100 percent owned by the Penn Central Transportation Co. That stock, that is, the Pennsylvania Co. stock, which is 100 percent owned by the Transportation Co. is pledged against bank loans.

There are further encumbrances against the land held by some of the companies in the Pennsylvania Co.

Mr. Kuykendall. Subsidiaries of the Pennsylvania Co.

Mr. Beggs. That are subsidiaries of the Pennsylvania Co., yes.

Mr. Kuykendall. Would you mind now drawing a line here to show that in your previous answers a few moments ago that you said that we could have access to that pledge stock but now you have drawn a line below which we don't have access?

Mr. Beggs. No, sir, I am not saying that. It is my understanding that the bank credit, which is extended against the stock of the Pennsylvania Co. has a covenant in the loan agreement which states that until the asset value of the Pennsylvania Co. itself exceeds by three times the value of the line of credit, then they cannot pledge further against those assets nor can they in any way levy against them.

However, it is my understanding further on the situation where a Government loan would come in, that that loan could take precedence over the line of credit that is now held by the banks. And that in that case, the Government loan would take precedence on all of the assets or against all of the assets of the Pennsylvania Co.

What I don't know, and I think what our lawyers are going to have to go back and research, is whether any of the loans which are against specific parcels of land may take precedence over anything else.

Mr. Kuykendall. If that land is not owned by the Pennsylvania Co. but is owned by a subsidiary of the Pennsylvania Co., this is the one we really need to know about?

---

Mr. Pickle. Thank you, Mr. Chairman.

I want to simply say to the Secretary that I regret I was late. I won't go into the same questioning because I understand from other members that they have basically the information that I wanted also.

I was still on the floor trying to defend the jurisdiction of this committee as against the recommendation of the Secretary of Transportation to usurp our jurisdiction to pay those armed guards. You won again, Mr. Secretary. You have some good friends on the Appropriations Committee who prevailed.

That, like this legislation, may be another matter for further discussion immediately after Congress reconvenes.

I would like to take this time to talk to you about the basic system, particularly the Southern Pacific in the southern part of the United States. I will pass that for now also. I do, in all seriousness, want to ask you one question.

If the loans are made in whatever amount we agree, and if default was brought about, would the U. S. Government be able to lay claim to and get title to the rights-of-way and the roadbeds of the particular road involved?

Secretary Volpe. As we discussed, Congressman Pickle, before you came in, these would be first mortgages, if I can use that term, on everything except their rolling stock.

There is the one question which Congressman Kuykendall has raised, which Mr. Dingell has raised and the chairman, and that is how do you get at some of these subsidiaries. This is a complicated and tangled problem. Our counsel, working with your counsel, will be sure that we have language which we think will grab anything that can be grabbed as first mortgages.