**In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.**

**In re COUNSEL FEES.**

**No. 70–347.**

United States District Court, E. D. Pennsylvania.

Nov. 11, 1977.

Ivan Shomer, Philadelphia, Pa., for the Trustees, Penn Central Transp. Co.

**570**

Gratz, Tate, Spiegel, Ervin & Ruthrauff by Spencer Ervin, Jr., Philadelphia, Pa., for Richard Joyce Smith, Trustee, New York, New Haven & Hartford Railroad Co.

Walsh & Frisch by Jerome K. Walsh, Jr., New York City, for Robert W. Valimont and George W. Betz, Trustees.

Goodman & Ewing by Mitchell L. Bach, Philadelphia, Pa., for Fairfax Leary and John Kohl, Trustees.

Ballard, Spahr, Andrews & Ingersoll by Lewis A. Grafman, Philadelphia, Pa., for Institutional Investors and Girard Trust Bank.

Kenneth G. Caplan, Washington, D. C., for I. C. C.

## MEMORANDUM AND ORDER NO. 3246

FULLAM, District Judge.

Two petitions relating to compensation of Court-approved special counsel to the Trustees are pending for decision. The first (Doc. No. 9023) concerns Blank, Rome, Klaus & Comisky (Blank, Rome) and Covington & Burling (Covington), and is referred to herein as the "Set-Aside Petition". After argument on the Set-Aside Petition, another petition (Doc. No. 13412), concerning Paul, Weiss, Rifkin & Garrison (Paul, Weiss) was filed. In the meantime, however, Congress enacted § 618(b)(4) of the Railroad Revitalization and Regulatory Reform Act of 1976, 45 U.S.C. § 791(b)(4), which provides that the powers exercised by the Interstate Commerce Commission (ICC) under § 77 are transferred to the various reorganization courts, as of the time of conveyance of the rail properties to Con-Rail.

Since the Paul, Weiss petition expressly raised the issue of the impact of § 618(b)(4) on these matters, the Trustees were directed to serve a copy of that petition upon the general counsel of the ICC. However, no response has been filed by the Commission.

## I. The Set-Aside Petition

### A. Introduction

In a § 77 reorganization, counsel for the Trustees may receive only such compensation and reimbursement of expenses as the reorganization court may from time to time allow, within the maximum limits fixed by the ICC. § 77(c)(2). Accordingly, the practice which has been followed in this proceeding since its inception has been for the Trustees from time to time to file with the Court petitions for authority to compensate special counsel. The Court would then refer these petitions to the ICC for its determination of the maximum limit of compensation. However, because of the extensive delays involved, and because of the unusual burdens of this case upon the law firms involved, the Court has, with the informal acquiescence of the Commission, usually authorized the Trustees to make immediate payment of some portion of the amount requested, as a payment on account. In authorizing these immediate partial payments, the Court was, of course, careful to keep the payments well below the predictable range of ICC decision, so as not to interfere with the Commission's exercise of its discretion. Thereafter, when the Commission acted upon such petitions, the Court would enter a further order authorizing payment of the balance, within the limits set by the Commission. All such orders contained the following provision: [1]

> "[This Order is] without prejudice to the right of [counsel] to institute any further appropriate proceeding to request the payment of additional compensation for services performed during this period."

In the Set-Aside Petition, the Trustees sought to have the Commission's Order of March 19, 1975 (Doc. No. 8694) concerning Covington's compensation for the period July 1, 1974 to September 30, 1974, set aside, and all earlier orders concerning

---

1. This was done because it was not clear whether the ICC intended its Order to be final for each period, or subject to further modification later (see text at p. 12); and because the firms' initial willingness to forego further "final" applications had been based upon the assumption that the time-charges would be honored in full.

Blank, Rome and Covington remanded to the Commission for reconsideration.

Since the Order which triggered the Set-Aside Petition relates to Covington, it is appropriate to review briefly the representation arrangement between the Trustees and that firm. In billing private clients, Covington follows the practice of establishing a guideline range of rates for each lawyer. With respect to a particular matter, the firm selects a rate within the guideline range. The difficulty of the work undertaken and the expertise of the lawyer in the field determine what hourly rate is actually charged. Consistently with Disciplinary Rule 2–106(B)(1)–(7), Covington also considers factors other than the guideline rates in arriving at its final fee. In dealing with the Trustees, however, Covington agreed to bill at a single rate for all partners and at another single rate for all associates. From 1970 through March of 1974, the time of partners was billed at $80 per hour, and the time of associates at $50 per hour. In April of 1974, these rates were increased by $10 per hour.

The use of a fixed rate for partners and associates was to the advantage of the Debtor's estate. For example, in the period covered by the Commission's Order, July through September 1974, the fees billed Penn Central were 78% of the fees which would have been charged if each lawyer's time had been billed at the high end of his or her guideline range of rates. Moreover, by limiting its fees to the time charges, Covington also relinquished an important right. In large reorganization cases, counsel often seek and are awarded fees in excess of time charges when the services rendered or the results obtained are considered extraordinary.[2] Each fee petition filed by the Trustees on Covington's behalf set forth the substance of the representation arrangement.

The ICC Order of March 1975 accurately summarizes the most important matters on which Covington worked during the relevant period. The Commission found

"That, in its capacities as special counsel and as special reorganization counsel, petitioner has performed services in connection with (1) the issues relating to the Regional Rail Reorganization Act of 1973 and other issues before various courts; (2) the problems of generating enough cash to provide adequate maintenance of its rail properties; (3) continuing problems arising from the relation with Amtrak; (4) the organization of non-rail assets into a separate entity and related tax matters; (5) the handling of pre-bankruptcy claims; (6) the final distribution of assets of the Boston & Providence Railroad; (7) the decision of the Commission in Ex Parte 305 allowing the 10-percent increase in freight rates but requiring revenues to be used for improved maintenance; (8) the petition of the Peoria & Eastern Railroad (P & E), a leased line, to impress a trust on the revenues derived from the operation of P & E's property; (9) providing legal advice to the Penn Central 'ad hoc' committee dealing with problems of the pension and retirement programs on a transfer of rail assets and employees to ConRail; and (10) attendance at weekly trustees' meetings."

The Commission further found that the work was "reasonably necessary to the administration of the estate" and that the work may have "an impact on the future developments and finalization of the Debtor's reorganization."

These observations were indubitably correct. In fact, the period July through September 1974 was a critical phase of these reorganization proceedings. For example, 45% of Covington's time was spent on appellate litigation involving the constitutionality of the RRRA. It was absolutely essential that these appeals be handled with unusual promptness and dispatch; the time pressures on the Covington firm were enormous. Of the remaining time, 32% was spent on general reorganization planning, and the remainder on various matters in litigation in this and other courts.

---

**2.** See footnote 1, *supra*.

Although the Commission found that Covington's work was both necessary and important, the Commission fixed a maximum which would permit payment of only 73% of the fee requested. The only reasons stated in support of this reduction were "the nature of the work" and the financial condition of the Debtor. This particular Order is typical of the orders which the Commission had entered previously. Substantial reductions from the amounts based on time charges were made by the Commission, without any further explanation. There is no suggestion, for example, that the Commission objected to the hourly rates charged, considered the work unimportant, or disparaged the quality or success of the efforts of counsel.

It is important to emphasize that the Commission's action now under consideration would disallow payments to Covington in excess of 73% of its time charges during a period in which its work concerned litigation relating to vital developments in the reorganization proceeding, including the validity of the RRRA. On the basis of that decision, the Trustees were confronted with a situation in which an agency of the United States Government was controlling (and curtailing) the fees of counsel who were litigating on behalf of the Trustees against the United States. On the other hand, the United States Railway Association had retained a private firm to handle the Valuation Case, but no court or agency would be reviewing the fees paid to that firm. The situation was exacerbated when the Commission, in its August 1975 brief submitted in reference to the Set-Aside Petition, suggested that if the Commission's maximum determinations were unsatisfactory, Covington should "initiate appropriate action to terminate their position as counsel to the Trustees" (Doc. No. 9245, at p. 18).

There is, of course, no suggestion that the Commission intended to sabotage the Trustees' litigation efforts vis-a-vis the Government. But it is fair to state that the parties concerned, including the Court, were uncomfortable in a situation which had the potential for that kind of conflict.

## B. *Legal Issues*

The Trustees' Set-Aside Petition is based upon the premise that ICC orders under § 77(c)(2) are subject to judicial review. The Commission has argued, on the other hand, that its § 77(c)(2) orders are not reviewable by this Court. The Commission further contends that, even when an allowance order of a reorganization court is properly before a court of appeals, the court of appeals may review the reorganization court's allowance within the Commission's fixed maximum, but lacks jurisdiction to review the Commission's determination of the maximum limit. In short, the Commission's view is that its orders are never subject to any form of judicial scrutiny.

A new factor has been introduced by the enactment of § 618(b)(4) of the Railroad Revitalization and Regulatory Reform Act of 1976, which has the effect of terminating the Commission's § 77 jurisdiction as of April 1, 1976, in reorganization proceedings to which the RRRA is applicable. This interpretation of the statute, see Memorandum and Order No. 2670, is apparently accepted by the Commission. On April 20, 1977, the Commission dismissed all pending Penn Central matters on its Finance Docket, including compensation petitions, for the stated reason that its jurisdiction under § 77 had been terminated by § 618(b)(4) of the RRRRA.

It is reasonable to interpret this course of conduct on the part of the Commission as indicating its view that it would no longer have jurisdiction to reconsider, on remand, orders which it may have entered before April 1, 1976. As noted above, the Commission's views on that question were invited in connection with the Paul, Weiss petition, but the Commission has not responded. Since the Commission contends that there can never be a remand, it may be that the issue is regarded as merely academic. At any rate, I am persuaded that § 618(b)(4) precludes reconsideration by the Commission, and that, if pre-April 1, 1976 compensation orders are judicially reviewable, the entire process must be completed in the reorganization courts.

■ I am unable to accept the Commission's contention that § 77(c)(2) orders are not reviewable in any judicial forum. In *RFC v. Bankers Trust Co.*, 318 U.S. 163, 63 S.Ct. 515, 87 L.Ed. 680 (1943), a case which preceded enactment of the Administrative Procedure Act (APA), the Court held that § 77(c)(12) orders of the Commission, fixing maximum limits of compensation for indenture trustees of securities issued by a § 77 debtor, are reviewable by the presiding reorganization court. Although the ICC was not a party to that case, it did appear as *amicus* and urged the position that its (c)(12) orders were not subject to judicial review. The Supreme Court specifically rejected that contention, holding that the legislative history relied upon by the Commission was not persuasive. 318 U.S. 163, n. 10, 63 S.Ct. 515, 87 L.Ed. 680 (1943).

The Commission now seeks to distinguish *Bankers Trust* on the basis of alleged differences between § 77(c)(12) orders and § 77(c)(2) orders. Hearings are required in connection with (c)(12) orders, whereas hearings are required on (c)(2) petitions only if the "Commission shall deem it necessary." And, (c)(12) provides that orders entered by the Commission may be appealed "independently of other appeals in the proceeding and shall be heard summarily," whereas there is no similar provision applicable to (c)(2) orders. From this it follows, the Commission argues, that its (c)(2) function differs from the traditional fact-finding function performed in connection with (c)(12) orders, with the result that the statute must be construed as vesting the Commission with unreviewable discretion under (c)(2).

In my view, however, the Commission's function under (c)(2) is precisely the same as the function it performs under (c)(12), namely, fixing the maximum limit of "reasonable" compensation to be allowed by the Court. There is simply no rational basis for holding that fact-finding is involved in fixing reasonable compensation limits for indenture trustees, but no fact-finding is involved in fixing reasonable compensation limits for a trustee or his counsel. Congress did not mandate a hearing on (c)(2)

petitions, but this does not mean that the Commission would be free to act without a written record, or without making findings. The Commission was given discretion to dispense with hearings in (c)(2) cases, presumably for the rather obvious reason that the detailed written submission by the applicant, coupled with the Commission's familiarity with the proceedings, would frequently supply all of the information needed for a factual determination. Ordinarily, the Commission would be much more familiar with the efforts of the reorganization trustee and his counsel, than with the activities of an indenture trustee under (c)(12).

The absence of a provision for an expedited appeal in § 77(c)(2) is also readily explained. Allowances under (c)(2) may be made from time to time; and, by § 77(*l*)'s incorporation of § 24 of the Bankruptcy Act, such allowance orders of the reorganization court are appealable in the ordinary course of the proceedings. *See* 5 *Collier on Bankruptcy*, § 77.29. On the other hand, § 77(c)(12) orders are most frequently entered in connection with the approval of a plan of reorganization. Congress apparently felt it desirable to permit review of such orders independently of any review of the plan, lest the plan proceedings be delayed while the indenture trustees might appeal from the distribution provisions of the plan providing their fees. This conclusion is reinforced by the statutory requirement that such appeals be expedited and disposed of on a summary basis.

If the Commission's non-reviewability thesis were accepted, trustees and their counsel in § 77 cases would have no right to a hearing before the Commission, and the Commission's orders would be final, with no right of review in any court. But trustees and their counsel are entitled, under § 77(c)(2), to receive reasonable compensation for the services they render. Serious questions of constitutional due process would be raised by a statutory scheme in which such rights were finally disposed of without either a hearing or judicial review. On the other hand, if judicial review by the reorganization court is available, the constitutional difficulty is removed.

Section 77 trustees and their counsel are officers of the court who carry out what is in essence the court's obligation to manage the properties during the pendency of the case. There is no conceivable reason for according greater rights of review to indenture trustees and other representatives of parties in interest, than to these court-appointed officers. Moreover, under § 77 the reorganization courts have exclusive authority both to remove trustees and to confirm the appointment of counsel. If judicial review of (c)(2) compensation orders is not available, the Commission could readily frustrate these functions of the court, merely by exercise of its unchecked power to fix compensation limits. Any such indirect veto power would be inconsistent with the statutory scheme. When Congress intended the Commission to have a veto power, its intention was clearly expressed, for example, § 77(c)(2) provides that the Commission must ratify the appointment of trustees.

For all of the foregoing reasons, I have concluded that the Commission's attempts to distinguish the *Bankers Trust* case are unavailing, and that its (c)(2) orders are judicially reviewable. I am also satisfied that review is available under § 702 of the Administrative Procedure Act (5 U.S.C. § 702). Judicial review of administrative agency adjudications is the rule rather than the exception. Judicial review is properly denied only if Congress has clearly expressed an intent to deny review, or if the matter for decision is one which is solely committed to agency discretion. As discussed above, Congress has not expressed an intent to preclude review of (c)(2) orders. And the fixing of limits of "reasonable compensation" is surely not a matter of agency discretion in the sense that there is no "law to apply." *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). As the Commission's leading decision involving 77(c)(2) makes clear, there is law to be applied. *In New York, N.H. & H. R.R. Co. Reorganization,* 342 ICC 632 (1970), the Commission explained at length its view of its statutory function under § 77(c)(2). According to the Commission, it considers

"not merely the time spent by counsel, but also, among other things, the nature and complexity of the work performed, the need for the services, the relative importance of the work in relation to other needs of the estate, the benefit to the estate, the availability of funds in the estate, and the individuals who actually perform the services. Also reviewed are the fixed and variable expenses involved in rendering the services for which compensation is being sought. The fixed expenses include such things as rent, salaries for associates and clerks, wages for secretaries and office staff personnel, and office supplies. The fixed expenses of operating the firm are normally allocated by counsel among his several clients. Usually, the counsel fees are sufficient to compensate for the fixed expenses incurred. The variable expenses are, for example, fees for consultants who provide services for the client not otherwise available from counsel, witnesses, court costs, printing expenses, photocopies of the court records, and travel expenses. The variable expenses are directly allocated to the service performed and their amount is readily determined. A determination must be made as to whether the allocations of the expenses—both fixed and variable—are reasonable in the circumstances of each situation. And in approving the compensation to be allowed counsel, the Commission establishes a reasonable limit to cover the fees and variable expenses incurred by counsel in rendering the necessary service." 342 ICC 632, 639 (1970).

While echoes of rate-making emerge clearly from this language, it is unnecessary to pursue the analogy. Under any view of the matter, a process of adjudication is described. Indeed, regardless of the language employed in describing the process, and even if the Commission had never had occasion to describe the process, the fact remains that any decision fixing maximum limits of reasonable compensation is necessarily an adjudication.

■ The scope of review is the "arbitrary and capricious" standard of § 706(2)(A) of the APA. Under this narrow standard, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment; the court is not empowered to substitute its judgment for that of the agency. *Bowman Trans., Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

Having concluded that the Commission's Order is judicially reviewable, and having defined the scope of review, the remaining legal issue is whether this Court is the appropriate forum to provide that review. For a number of reasons, I am persuaded that it is. In the first place, no one has suggested any other forum, and none comes to mind. Second, 28 U.S.C. § 1336(b) furnishes at least a useful analogy; it provides that a court which refers a matter to the ICC has exclusive jurisdiction over any civil action to set aside the action of the Commission. Finally, it would seem that, in the absence of § 618(b)(4) of the RRRRA, the petitioners would have the right to seek reconsideration by the Finance Division.[3] *See* Rule 101(a)(3) of the Commission's General Rules of Practice, 49 CFR § 1100.101. Section 618(b)(4) did not merely terminate the Commission's jurisdiction; it transferred the Commission's functions to the reorganization court. For all of these reasons, as well as because of this Court's general familiarity with the issues involved, I believe this Court is the appropriate forum.

I recognize a surface implausibility in this conclusion. Section 77(c)(2) permits this Court to award counsel fees only within such maximum limits as the Commission may determine. This Court is not empowered by § 77(c)(2) to fix the maximum limits itself. And it therefore seems anomalous to hold that this Court nevertheless has jurisdiction to review the Commission's determination of those maximum limits. (But this is, of course, what *RFC v. Bankers Trust Co., supra,* holds). It must be remem-bered, however, that a decision by a reviewing court that the Commission's Order fixing maximum limits is unlawful under the arbitrary and capricious standard of review is not a decision by that Court as to what the proper limits should be. A remand to the Commission for reconsideration, or for explication of its reasoning, would plainly not usurp the functions assigned to the Commission under (c)(2). Thus, even in the ordinary case not affected by § 618(b)(4) of the RRRRA, judicial review by the reorganization court (whose actions would, of course, themselves be reviewable by the Court of Appeals) is consistent with the statutory scheme.

## II. *The Merits*

■ The Commission's Order fixing Covington's compensation limit is defective because of the inadequacy of the reasons advanced in support of the decision. The label "nature of the work" sheds no light upon the Commission's reasoning, and the reference to the financial condition of the Debtor strongly suggests that the Commission was applying a legally erroneous standard. If the Commission meant that the Penn Central estate was so lacking in financial resources that the estate and its creditors were entitled to expect counsel to provide legal services at vastly reduced rates, the Commission was plainly wrong; or, more precisely, evidentiary support for such a conclusion is totally lacking. Moreover, what is the just and reasonable *maximum* limit for compensation is not governed, and arguably should not even be influenced, by "financial condition" in the abstract.

The function of the Commission under § 77(c)(2) is to make sure that railroads in reorganization do not pay counsel fees in excess of what is reasonable for the services performed, or in such amounts as would unreasonably burden their ability to provide adequate rail service, or their ability to emerge from reorganization. The Commission did not find that the hourly rates charged were unreasonable, nor could it

---

**3.** See footnote 1, *supra.*

have: The rates charged are well within normal limits, and substantially below the rates charged by private counsel for other parties in this proceeding. The Commission did not find that payment of the requested amounts would unduly burden the Debtor's rail operations, or threaten its reorganization. Indeed, any such finding would be irrational on this record. Moreover, I regard it as highly doubtful that the vicissitudes of a debtor's cash flow during reorganization should govern determination of the maximum just and reasonable compensation. If cash flow were to have that effect, in the context of this reorganization, in which cash flow varied widely from day to day, the Commission would indeed be applying a highly volatile standard. Temporary cash strictures should, of course, be taken into account by the Court in actually awarding compensation. But if such matters are to be considered by the Commission in fixing the maximum, then, at the very least, its determinations should be subject to reconsideration, and to further adjustment based upon the overall financial condition of the Debtor.

I am not unmindful of the fact that, in many contexts, applicants for compensation awards frame their applications in the expectation that the award will be reduced. It may be that the Commission has been faced with such applications in the past. But in the present case, the Trustees and their counsel carefully worked out an arrangement providing distinct economies to the estate; the applications are based solely on time charges; and there is simply no "fat" to be excised. I am firmly convinced that significant reductions of the type embodied in the Commission's Order would be seriously detrimental to this reorganization. The fees requested by Covington are less than those charged by counsel to the Indenture Trustees, and well within the recommendations of the SEC in comparable Chapter X proceedings (*e. g.,* the *Equity Funding* proceeding). Accordingly, an Order will be entered, allowing Covington the difference between the $71,450.60 previously paid and the requested amount of $98,-325.

The Paul, Weiss petition presents slightly different considerations. The application covers services rendered from June of 1971 to December of 1974. The firm's assignments had to do with the proposed sale of the Debtor's Park Avenue properties, *see In the Matter of Penn Central Trans. Co. (Sale of Park Avenue Properties),* 354 F.Supp. 717 (E.D.Pa.1972), *rev'd in part,* 484 F.2d 323 (3d Cir. 1973) and the litigation relating to the proposed Pennco Settlement agreement. *See In the Matter of Penn Central Trans. Co. (Pennco Settlement Agreement),* 358 F.Supp. 154 (E.D.Pa.1973). The first application to this Court covered the period from June 15, 1971 through June 30, 1972 (Doc. No. 4092). The Commission fixed the maximum at $48,775, representing a 15% reduction in the amount requested. The reduction was not explained. The next two applications covered periods ending December 31, 1972 (Doc. No. 5426) and March 31, 1973 (Doc. No. 5825). Because the Commission determined that the information supplied in the applications was not sufficiently detailed (Doc. No. 7685), it fixed the maximum limits at zero, but authorized the filing of a petition for reconsideration. The desired additional information was supplied and a petition for reconsideration filed, but no action was ever taken by the Commission on that application. The last of the four Paul, Weiss petitions covered the period ending December 31, 1974 (Doc. No. 9275); it was never acted upon by the Commission.

Thus, only the first petition was actually disposed of by the Commission, and its Order is subject to the same infirmity, lack of reasons in support, discussed in connection with the Covington applications. All four petitions are therefore properly before the Court for final action at this time.

Paul, Weiss has billed the Trustees on the basis of time spent, but with different hourly rates for the various lawyers involved. The rates are, in each case, the normal rates charged by that firm for the services of the particular lawyer. Some of these hourly rates are substantially in excess of the hourly rates charged by other counsel in

these proceedings, and the total compensation requested, divided by the total number of hours spent, produces an average hourly rate which is significantly higher than the average hourly rates of other counsel involved in these proceedings. Since the Paul, Weiss firm was retained on an *ad hoc* basis for two specific assignments, rather than on a continuing basis with expectation of an ongoing relationship, there is justification for some difference in the rate of compensation. Moreover, the tasks were extremely complex, and involved issues of great magnitude; and prevailing rates, and overhead expenses, in the New York City area are undoubtedly higher than elsewhere. I believe the proper approach is to use the Covington arrangement as an acceptable "standard," but to adjust it upward somewhat in recognition of these differences. During all but the last six months of the period covered by the Paul, Weiss applications, this "standard" rate would have represented an average of $80 per hour for partners and $50 per hour for associates. During the last six months, these rates would have increased to $90 and $60, respectively. The total fees requested by Paul, Weiss amount to $651,900. If the 80/50 formula were applied, the total would be $549,287. If the 90/60 formula were applied, the total would be $638,082. I have concluded that an award of $600,000, plus reimbursement of the claimed expenses, is appropriate. This adjustment should not be interpreted as a reflection upon the abilities or performance of the eminent counsel involved, or the value of their services in the market place. It is simply this Court's judgment as to what is reasonable and acceptable in the context of this case.

### ORDER NO. 3246

AND NOW, this 11th day of November, 1977, upon consideration of the Trustees' Petitions "To Set Aside Maximum Allowance Fixed by Interstate Commerce Commission for Compensation to Special Counsel and Special Reorganization Counsel" (Doc. No. 9023) and "For Authority to Compensate and to Pay the Balance of Compensation to Paul, Weiss, Rifkind, Wharton & Garrison, as Special Counsel for the Period June 15, 1971 through December 31, 1974" (Doc. No. 13412) it is ORDERED that:

1. The Trustees' request that all § 77(c)(2) petitions to compensate Blank, Rome, Klaus & Comisky and Covington and Burling be remanded to the Interstate Commerce Commission is DISMISSED as moot.

2. For the period July 1, 1974 to September 30, 1974, $98,325 is reasonable compensation for the services rendered by Covington & Burling and the Trustees are authorized to pay Covington & Burling $26,870.40, the difference between such reasonable compensation and the amount previously authorized to be paid.

3. For the period June 15, 1971 through December 31, 1974, $600,000 is reasonable compensation for services rendered by Paul, Weiss, Rifkind & Garrison, and $41,142.02 is appropriate as reimbursement for necessary expenses, and the Trustees are authorized to pay Paul, Weiss $209,525, the difference between such reasonable compensation and the amount of compensation previously authorized to be paid, and $1,536.65, the difference between such expenses and expenses previously authorized to be paid.