In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

In re BEECH CREEK RAILROAD COMPANY.

In re the CLEVELAND, CINCINNATI, CHICAGO AND ST. LOUIS RAILWAY COMPANY.

In re the CLEVELAND & PITTSBURGH RAILROAD COMPANY.

In re ERIE AND PITTSBURGH RAILROAD COMPANY.

In re PENNDEL COMPANY, Secondary Debtors.

In re PITTSBURGH, FORT WAYNE AND CHICAGO RAILWAY COMPANY.

In re ALLOWANCES UNDER § 77(c)(2).

No. Bky 70–347.

United States District Court, E. D. Pennsylvania.

Aug. 9, 1979.

Jerome K. Walsh, New York City, Robert W. Valimont, Doylestown and George W. Betz, Jr., Paul R. Duke, Robert W. Blanchette, Philadelphia, for plaintiff.

MEMORANDUM AND ORDER NOS. 3991, 156, 243, 184, 160, 182 and 175.

FULLAM, District Judge.

Section 77(c)(2) of the Bankruptcy Act authorizes the reorganization court to allow reasonable compensation to trustees.[1] In the Penn Central case, the compensation of the Trustees was fixed annually at the beginning of the compensation year, and the Trustees were paid on a monthly basis. This approach was possible because the magnitude and pace of the reorganization proceedings were such that the work load in any given year was relatively predictable. The Trustees of the Secondary Debtors were compensated in lump sums at the con-

---

1. Prior to the enactment of the Railroad Revitalization Act of 1976, the Interstate Commerce Commission fixed the maximum compensation of trustees and their counsel and the reorganization court made allowance within the amount fixed by the Commission. Section 618(b)(4), 45 U.S.C. § 791(b)(4), eliminated the Commission's participation in the § 77 proceedings of railroads, including Penn Central, subject to the Regional Rail Reorganization Act of 1973. *See In re Penn Central Trans. Co.*, 440 F.Supp. 569 (E.D.Pa.1977).

clusion of each years's service. Robert W. Blanchette, Esq., one of the Penn Central's Trustees, and two of the Trustees of the Secondary Debtors, George W. Betz [2] and Robert W. Valimont, Esq.,[3] have filed petitions for compensation in addition to that previously allowed to them. Notice of these applications has been given, but no objection or request for a hearing has been filed.

Four persons were originally appointed as Trustees of the Penn Central estate: George P. Baker, Richard C. Bond, Jervis Langdon, Jr. and Willard W. Wirtz. Mr. Wirtz resigned in early 1972, and for the remainder of the reorganization proceedings, three persons served as Trustees.[4] From the beginning only one Trustee was full-time; the others devoted varying amounts of their time to their duties as Trustees. Mr. Langdon was the full-time Trustee until March 7, 1974, when he resigned his trusteeship to become the chief operating officer of the railroad. Mr. Langdon's compensation as a full-time Trustee from 1970 through March of 1974 was $95,000 per annum,[5] and when he became the chief operating officer, his salary was increased to $100,000.

Mr. Blanchette, who served as counsel for the Trustees since their appointment, assumed the duties of full-time Trustee when Mr. Langdon resigned. His compensation was fixed at Mr. Langdon's previous level of $95,000. In June of 1975, Mr. Blanchette, was designated Chairman of the Board of Trustees, and in May of 1976, upon the conveyance of Penn Central's rail properties to ConRail, Mr. Blanchette also assumed the duties of Chief Executive Officer. Mr. Blanchette's compensation remained at $95,000 per annum until August of 1976, when it was increased to $120,000 per annum. In December of 1976, Mr. Blanchette became affiliated with a law firm and, because it was assumed his time commitment to Penn Central would be reduced, his compensation was reduced to $80,000 per annum.

It is unnecessary to recapitulate here the course of the reorganization proceedings.[6] It suffices to note that the case presented unique problems for the Trustees charged with fiduciary responsibility toward everyone with an interest in the railroad's survival. From the Court's perspective, the relatively short duration of the proceedings and the ultimate benefits conferred by the Plan of Reorganization to all concerned represent an exceptional accomplishment. During Mr. Blanchette's continuous service to the estate, he applied himself to his respective duties as counsel and Trustee with admirable dedication and energy and his contributions and achievements deserve nothing but praise. Although no one person or group was wholly responsible for the outcome of these reorganization proceedings, Mr. Blanchette and the other men who served as Trustees of the Penn Central performed their fiduciary duties with distinction, and are entitled to the major share of credit.

In addition to Mr. Blanchette's performance, a number of points warrant special mention. For almost six years, the compen-

2. Mr. Betz was appointed Trustee of the Beech Creek; Cleveland & Pittsburgh; Erie & Pittsburgh; and the Penndel Railroad companies on March 3, 1974. In September of 1975, he was also appointed Trustee of the Cleveland, Cincinnati, Chicago & St. Louis Railway Company. These roads owned approximately 4,000 route miles of the Penn Central system.

3. Mr. Valimont served as Trustee of the Pittsburgh, Fort Wayne and Chicago Railway Company which owned the main line from Pittsburgh to Chicago.

4. Mr. Baker resigned later and was succeeded by John H. McArthur.

5. Although maximum compensation established by the Interstate Commerce Commission (see fn. 1, *supra*) was $300,000 per annum, the total compensation for the four Trustees allowed by the Court was $250,000. Messrs. Baker and Bond received $40,000 each, and Mr. Wirtz received $75,000. When the trusteeship was reduced to three persons, the Commission reduced the maximum accordingly, but the total allowed by the Court was still well below the Commission's maximum.

6. The history of the Penn Central proceedings is chronicled in *In re Penn Central Trans. Co.*, 458 F.Supp. 1234 (E.D.Pa.1978).

sation for the full-time Trustee of the Penn Central remained at $95,000, and when Mr. Blanchette's compensation was increased in 1976, by 26%, his annual compensation was still far below the amount which the full-time Trustee would have received if there had been a minimal 7% or 8% annual increase in the full-time Trustee's compensation. Moreover, aside from the modest insurance benefits Mr. Blanchette received from the estate, he received none of the benefits executives of major firms normally receive. For example, Mr. Blanchette received no pension benefits for his service to the estate. If he had been part of the regular Penn Central pension system during his association with the estate, his pension at age 62 would have been in excess of $20,000.

In sharp contrast to the compensation paid Mr. Blanchette, and indeed his predecessor, Mr. Langdon, the chief operating officer hired by the Trustees shortly after the reorganization proceedings started received an annual salary of $165,000. This amount was in the mid-range of what executives with comparable responsibilities in the railroad industry were earning in 1970. The salaries of railroad executives increased substantially in the succeeding years to the point that in 1977 the chief executive officer of a typical major railroad was earning between $250,000 and $400,000 per annum. Finally, it should be noted that even though Mr. Blanchette's compensation for 1977 and 1978 was set on the assumption he would not devote full time to his trusteeship, it turned out that, because the Plan of Reorganization was formulated, presented to the Court, and consummated during this period, Mr. Blanchette's actual time spent on behalf of the estate was equivalent to that of a productive full-time executive.

■ In fixing compensation in these circumstances, it is important to avoid both timidity and irresponsibility. Competent and industrious people should not be discouraged from accepting trusteeships in major reorganization cases because the ultimate compensation for their services will not be commensurate with their profession-

al skills and capacity for achievement. Awards of fair and reasonable compensation, even at high levels, are a necessity if the public policies reflected in the reorganization chapters of the Bankruptcy Act are to be achieved. On the other hand, the fact that the value of the assets is very large and the creditor interests diffuse should not lead to overly generous awards. Striking the right balance in an individual case is a difficult task.

■ Mr. Blanchette will be awarded a total of $315,000 in additional compensation for his eight-plus years of service. That figure has three separate components. First, $50,000 of that amount is the rough equivalent of the pension benefits Mr. Blanchette would have received had he been in the Penn Central pension system during his years of service. For almost all of his service, Mr. Blanchette's sole professional activity involved his service to the estate, and, frankly, in 1970, when the pension benefit question first arose, I did not really focus on the economic significance of pension benefits in fixing his compensation. Second, in 1977–78, Mr. Blanchette's service was equal to that of a full-time executive, but he was compensated on the assumption that he would devote about two-thirds of his working time to the trusteeship. Moreover, in light of the intensity and nature of the work during 1977 and 1978, an increment in the annual salary base would have been appropriate. The adjustment for the 1977–78 period is about $75,000. The balance, $190,000, constitutes the traditional kind of final award made by reorganization courts based primarily on the quality of services rendered and the contributions made by Mr. Blanchette to a favorable result. In this case, there is the added factor that by any standards the compensation previously allowed for full-time service as a Trustee was, at least after the first year or two, too low for the responsibilities undertaken.

The applications of Messrs. Betz and Valimont present a somewhat different situation. The Secondary Debtors were corporations which had leased their rail properties

to the Penn Central. Neither Trustee bore any operating responsibilities. On the other hand, both were appointed Trustees in the midst of the litigation involving the Rail Reorganization Act of 1973. From that point forward, both Trustees were thrust into a complex and frequently elusive legal context in which the judgments which had to be made were extraordinary. At various times the parent company, Penn Central, was friend or foe, depending upon the litigation context. Ultimately, the Plan formulation and litigation process resulted in provisions in the Plan of Reorganization which were satisfactory to both Trustees and benefitted the public holders of the securities of the companies for which they served as Trustees.

Mr. Valimont was compensated at an annual level of $25,000 for his services. Mr. Betz also received $25,000 per year for his services, but when he was later appointed to serve as Trustee for the Cleveland, Cincinnati, Chicago and St. Louis Railway Company, his annual compensation was increased to $40,000. The actual time expended by both Trustees in their years of service works out to an hourly compensation level of $75 to $100 per hour. Viewed in the abstract, such hourly rates seem quite fair. On the other hand, the responsibilities assumed by both men and their commitments to be available when necessary to discharge their fiduciary responsibilities make sole reliance on hourly rates inappropriate. Finally, while the situations for the various estates differed, there is no question but that the Plans of Reorganization of the various estates conferred substantial benefit on the public shareholders and bondholders of the estates.

Messrs. Betz and Valimont will each be allowed an additional $35,000 for their services to their respective estates.